## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| Bruce A. Kolman, Stephen P. Moore and Jeanne Rice, on behalf of themselves and all others similarly situated, | : : : : | |
| Plaintiffs, | : : | Civil Action No.: _____ |
| v. | : : : | **CLASS ACTION COMPLAINT** |
| Amadeus IT Group, S.A., Amadeus North America, Inc., Amadeus Americas, Inc., Sabre Corporation f/k/a Sabre Holdings Corporation, Sabre Holdings Corporation, Sabre GLBL Inc., Sabre Travel International Limited, Travelport Worldwide Limited, and Travelport LP d/b/a Travelport, | : : : : : : : : : | |
| Defendants. | : : : : : : : : : : | |

## TABLE OF CONTENTS

I.   INTRODUCTION ................................................................................................ 1

II.  JURISDICTION AND VENUE ....................................................................... 11

III. PARTIES ........................................................................................................ 12

     A.   Plaintiffs. ............................................................................................. 12

     B.   Defendants. .......................................................................................... 12

IV. THE GDS PRODUCT AND GEOGRAPHIC MARKET. ................................ 15

V.   FACTS GIVING RISE TO CLAIMS FOR RELIEF ...................................... 16

     A.   History of the GDS Market ................................................................. 16

         1.   1960s-1984: The Creation and Evolution of GDSs. ................... 16

         2.   1984-December 2003: GDS Regulation by the Department of
             Transportation. ................................................................................. 16

             a.   DOT regulations require content and fee parity. ................... 16

             b.   DOT regulations allow the Airlines to withhold content. .... 17

             c.   Defendants and the Airlines negotiate the last GDS agreements of the
                 regulatory era. ....................................................................... 19

         3.   January 2004: The DOT Deregulates GDSs Despite Concerns About
             Potential Abuse of Market Power. .................................................. 19

     B.   GDSs Were Increasingly Threatened by Competition from Innovative
         Alternatives for Booking Air Travel. ................................................. 23

         1.   The Alternatives to GDSs ............................................................ 24

             a.   The Airlines' own websites ................................................. 24

             b.   GNEs ..................................................................................... 24

             c.   OTAs ..................................................................................... 29

             d.   Meta-search engines ............................................................. 27

             e.   Brick-and-mortar travel agencies ........................................ 28

i

2.    Defendants Fear Channel Shifting Will End Their Reign Over the GDS Market. ................................................................................................ 29

C.    Defendants Collude to Thwart Burgeoning Competition. .................................... 31

     1.    Sabre Forms Project Atlas to Combat the Airlines' Content Leverage. ...... 31

     2.    Sabre Launches Project Nike to Forestall Competition From New Entrants: the "Full-Content" Strategy. ...................................................................... 32

D.    2006: Defendants Implement Their Post-Deregulation Strategy by Jointly Demanding Full Content and Prohibiting the Airlines from Offering Lower Fares Elsewhere. ...................................................................................................... 34

     1.    When Their GDS Agreements Expire, the Airlines Attempt to Stimulate Competition Among GDSs by Surcharging. ................................................ 34

     2.    Defendants Form Their Conspiracy. ........................................................... 36

     3.    Sabre and Amadeus Enter Into the Backstop Agreement to Provide Each Other Airline Content That Only One Receives. ......................................... 37

     4.    The Cascade of "Full Content" Contracts in the Post-Deregulation World. 39

     5.    The Contractual Restraint Forces the Airlines to Furnish All of their Content and Denies the Airlines the Ability to Discount or Surcharge Fares. .......... 43

E.    Defendants Cartel Continues. ............................................................................. 44

     1.    Defendants Use the Full Content Committee to Further and Enforce Their Conspiracy. ................................................................................................ 44

     2.    Defendants Meet to Align Pricing and Ancillary Content Strategy Before Contract Renewals. .................................................................................... 46

     3.    Coordinated Opposition to American's Direct Connection Program .......... 54

     4.    Other Collusive Behavior ........................................................................... 55

     5.    Defendants Maintain Their Conspiracy to Secure Full Content in Subsequent Contract Renewals. .................................................................. 56

F.    The GDS Market Characteristics Are Conducive to Collusion. ......................... 56

     1.    The Market Is Highly Concentrated. .......................................................... 57

     2.    There Are High Barriers to Entry Into the GDS Market. ............................ 59

     3.    Prices for GDS Services Are Inelastic. ...................................................... 58

ii

4.     Defendants Have Many Opportunities To Collude. ..................................... 60

5.     Defendants Act Against Their Self-Interests. ............................................... 61

G.    Anticompetitive Effect of the Contractual Restraint. .......................................... 62

1.     The Contractual Restraint Insulates Defendants From Price Competition. . 63

2.     The Contractual Restraint Causes Economic Injury to Plaintiffs and the Rest of the Class by Artificially Inflating Ticket Prices for All Passengers........ 70

VI.  CLASS ACTION ALLEGATIONS ................................................................................ 69

VII. TRADE AND COMMERCE ........................................................................................... 71

VIII. ANTITRUST IMPACT ................................................................................................... 72

IX.  FRADULENT CONCEALMENT .................................................................................. 75

X.   CONTINUING VIOLATIONS ....................................................................................... 80

XI.  CLAIMS FOR RELIEF .................................................................................................. 81

XII. PRAYER FOR RELIEF .................................................................................................. 99

iii

## I.      INTRODUCTION

"Extortion plus bribery works."

> — *Sabre internal PowerPoint slide titled, "Why do airlines distribute through Sabre?"*

1.      "Extortion plus bribery works" aptly describes the business model Defendants use to maintain a market for their antiquated airline flight and fare information aggregation platforms. Defendants are technology providers to the global travel and tourism industry.  They provide a technological link between travel suppliers (such as airlines, hotels, car rental companies, rail operators and cruise lines) with online and traditional "brick-and-mortar" travel agencies.  These systems used by travel agents to link to airline information are known as "global distribution systems" ("GDS").

2.      The nation's "legacy" airlines—American, Continental (merged into United in 2010), Delta, Northwest (merged into Delta in 2008), United and US Airways, and the smaller airlines AirTran (merged into Southwest in 2011), Alaska and JetBlue (collectively, the "Airlines"), rely heavily on Defendants' GDSs. Defendants, who collectively control nearly 100% of the United States market for GDS services, have conspired since 2006 to foreclose competition among themselves and from less costly distribution channels, enabling them to charge supracompetitive GDS fees that have inflated ticket prices for airline passengers.

3.      Defendants' GDSs function as electronic networks for the centralized distribution of flight, fare, and related information ("content") for the vast majority of airlines. Each Airline provides its content to the GDSs, which in turn assemble the information and make it available to both brick-and-mortar and online travel agents. For each flight segment booked by a travel agent that uses a GDS, the Airline is charged a fee ("GDS fee"). Airlines pay Defendants roughly $2.4 billion per year in GDS fees.

4.      Because nearly all travel agencies use GDSs, the GDS channel is critical for the Airlines to reach many of their customers, in particular, high-revenue business travelers. Because many travel agencies subscribe to only one GDS, each airline must have its content listed on each GDS. Similarly, each GDS must have access to every Airline's content to service their travel agency customers. If, for instance, a GDS did not have access to Delta's content, it would quickly lose bookings to a GDS that did. The amount of content each Airline offers to a GDS is therefore a critical concern to Defendants.

5.      Defendants execute the "extortion" element of their conspiracy by extracting GDS fees that far exceed what a competitive market would allow. To accomplish this, Defendants colluded to impose a set of unlawful contractual provisions on the Airlines (the "Contractual Restraint"), which is contained in every GDS agreement between a Defendant and an Airline.

6.      The Contractual Restraint requires the Airlines to make all of their content available on the Defendants' GDSs and prohibits the Airlines from offering lower fares through less costly distribution channels and from surcharging travel agents for using a GDS rather than a less costly platform. By doing so, the Contractual Restraint removes any leverage an airline would otherwise have to negotiate lower GDS fees. By requiring fares available through a GDS to be priced at parity, regardless of the distribution channel, the Contractual Restraint eliminates price competition among the Defendants, neutralizes the potential of lower cost entrants and stems the shift of bookings to the Airlines' own websites, thereby insulating GDS fees from competitive pressure.

7.      Defendants facilitate their conspiracy with the "bribery" piece of their scheme. Defendants kicked back a portion of their exorbitant GDS fees to the travel agents who use their

2

GDSs to book flights. Buying travel agents' loyalty—in effect, using GDS fees to buy demand for their product—is essential to the success of Defendants' conspiracy because any defection by travel agents from the GDSs would reduce airline dependence on GDSs to reach travelers. Less demand for GDSs would give the Airlines needed leverage to negotiate lower GDS fees and to transact directly with travel agents or through cheaper, more efficient distribution channels.

8.      In contract negotiations before 2006, when GDSs were regulated by the DOT, the Airlines negotiated agreements with Defendants that allowed the Airlines to choose their level of participation in a GDS. If an airline elected to withhold certain fares from the GDSs and instead offer those fares on its own website, the airline paid higher GDS fees. Conversely, an airline could agree to provide more content in return for lower GDS fees. But an airline could not offer differentiated content to only one GDS—in other words, it could not play one GDS against another in contract negotiations.

9.      All that changed in 2006, when GDS contracts came up for renewal. For the first time, the DOT no longer regulated airline flight and fare distribution systems.  For the first time in the deregulated GDS market, the Airlines were not required to make the same content available to all GDSs. Theoretically they could play one GDS off another with valuable leverage: limiting or differentiating content to any GDS. And, if a GDS demanded fees an airline found to be too high, that airline could surcharge travel agents who used that GDS, known as a "non-preferred" channel.  Thus, during the negotiations following deregulation, the Airlines had two goals: (1) avoid ticket distribution through a GDS channel when they could, and (2) when they could not do that, use their new leverage to negotiate lower GDS fees.

10.      At the same time Defendants were confronted with the Airlines' new negotiating leverage, they were also facing increased competition from incipient distribution channels. The

rise of the Internet and the development of new advanced technologies threatened to end

Defendants' dominance. The Airlines wanted to push personalized fares, upgrades, and amenities

to their customers, something Defendants' static mainframe computers could not do. Enormous

gains in efficiency promised markedly lower transaction costs that would translate into much

lower booking fees. These innovations posed a grave threat to GDSs still operating on primitive

computers that ran outmoded software. Since their introduction in the 1960s, GDSs saw limited

technological advancement. Indeed, the GDSs displayed information to travel agents in crude

formats and required them to enter archaic commands, both vestiges of DOS-based computing.

11.     The competitive threats encountered by Defendants came from multiple sources,

each of which allowed travel agents and their customers to bypass GDSs and purchase tickets

directly from the Airlines. One threat was the Airlines' own booking websites. The Airlines

aggressively rolled out "direct connect" programs to entice travel agents. The utility of these

websites and programs was enhanced by third parties who could aggregate content from

numerous airlines and display them on user-friendly websites. These channels provided the

Airlines with significant cost savings, allowing them to encourage online booking by offering

special low-priced "webfares," frequent flier miles and other amenities to entice customers.

12.     Another threat came from a group of startup companies that offered swifter,

cheaper and more user-friendly electronic reservation systems more compatible with the

Airlines' new a la carte business models. Called "GDS new entrants," or "GNEs," these versatile

and cutting-edge distribution channels were well financed and enjoyed support from the Airlines,

which had grown weary of high GDS fees. Defendants perceived these start-up GNEs as

menaces that could revolutionize airline travel reservation. For example, as early at 2004, Sabre

determined that some GNEs had "viable technologies" that were "likely to overcome technical and operational barriers to entry" and "pose substantive threats to the traditional GDS model."

13.     This assault by formidable foes—many of which were new to the GDS market after deregulation—was a clear and present danger to Defendants, who had never before faced viable competitive threats.  The prospect of differentiated content and surcharges for using Defendants' high-priced distribution channel would destroy Defendants' pricing leverage.  In the words of one Defendant, such competition would lead to "a completely transparent channel that will spiral prices downward."  Sabre alone estimated a loss of $270 million in annual revenues if they had to compete with non-GDS channels for the Airlines' content.

14.     Recognizing that they were "not built for speed, agility and innovation," Defendants devised a plan to obtain all fares from all the Airlines and to ensure that their travel agent subscribers would not be surcharged.  In a newspaper op-ed, one Defendant posed the question:  Would the "industry players work together?"

15.     Defendants had many opportunities to "work together." Key executives from each Defendant attended numerous trade association conferences, often to make panel presentations about the future of GDSs.  Sabre's president noted in 2009 that "[a]s a normal course of business, we meet. In fact, we have other GDSs' in house today."

16.     Defendants did, indeed, work together. Plaintiffs' investigation to date has uncovered that at least 13 of Defendants' highest level employees exchanged strategy or pricing information at 13 different trade association conferences, in emails or in other meetings, including, among others, Amadeus' Executive Vice President, Commercial, Amadeus' Director of Airline Distribution Strategy, Sabre's Executive Vice President and Chief Marketing Officer, Sabre's Vice President of Product Management, Sabre's Director of Product Marketing,

Travelport's President and Managing Director of the Americas, and Travelport's Vice President of Product Programs & Services.

17.     Desperate to preserve their control over the ticket distribution market, Defendants responded to the increased competition by colluding to protect their outmoded GDS dynasty. Defendants chose to conspire instead of creating a better product. The Contractual Restraint—rather than innovation or competitive prices—would be the "tactical vehicle . . . to achiev[e] [their] strategic goals."

18.     Defendants could never have demanded full-content agreements unilaterally—to implement the Contractual Restraint, they needed to conspire.  In fact, each Defendant's past unilateral attempts to obtain full content fares at parity with all channels failed. The earlier contracts allowed the Airlines to withhold content such as webfares, and to impose surcharges on GDS channel sales. So, Defendants jointly demanded that the Contractual Restraint be included in all new GDS agreements. In the words of a Sabre GDS senior executive, "We will be protected by our agreement[s] not by the technology."

19.     A crucial element of Defendants' conspiracy was a written agreement whose express purpose was to help ensure full content and prevent price competition (the "Backstop Agreement"). Sabre and Amadeus—the market leaders in North America and Europe, respectively—entered into the Backstop Agreement in March 2006, when they were engaged in negotiations with the Airlines for new GDS contracts. In it they made reciprocal promises to supply each other with any content that any airline refused to provide the other.

20.     The Backstop Agreement prevented the Airlines from forcing one GDS to compete against another. As one Sabre executive explained, the Backstop Agreement was "an insurance policy" that was "Good for the GDS Channel" because "besides increasing the

6

likelihood that Sabre will have access to all the content we need, this agreement takes away any incentive for either GDS to give a super low bkg [booking] fee for exclusivity. Good for the GDS channel (if you are Sabre or Amadeus)."

21.     Amadeus admitted under oath that the Backstop Agreement "was entered against the background of American's very public announcements at the time that it might not continue to participate in all the GDSs."

22.     In this "insurance policy" against competition, Sabre and Amadeus agreed to exchange their pricing data. Perhaps recognizing the obvious legal implications of sharing sensitive pricing data with a horizontal competitor while both were negotiating their GDS fees with airlines, the terms of the agreement allowed only finance people, and not pricing policy people, to access the pricing data.  In practice, it is highly unlikely that Sabre and Amadeus did not use this information to their mutual advantage and to the detriment of the Airlines with whom they were negotiating new contacts.

23.     With the Backstop Agreement in place, Defendants locked arms and confronted the Airlines with the Contractual Restraint, substantially identical for each Defendant, as a non-negotiable condition of renewing their GDS agreements. This uniform approach alone is evidence of Defendants' cartel. Absent agreement, each Defendant would have been forced to negotiate with the Airlines to win their business. None of the Defendants would have braved a take-it-or-leave-it ultimatum – like the Contractual Restraint – that risked losing GDS contracts while their competitors captured all of the Airlines' business. In a competitive environment, a Defendant who received exclusive content from an airline would have used it for competitive advantage, rather than sharing it with another GDS, as explicitly promised in the Backstop Agreement.

7

24.     The Airlines initially balked at the Contractual Restraint. But they could not break what we now know was cartel behavior. Reality set in. Facing the specter of financial ruin from having their flights "delisted" by the GDSs, the Airlines ultimately acceded to Defendants' demands and executed the contracts.  The cartel succeeded. In an internal email, a Defendant touted the Contractual Restraints as the death knell for new entrants: "We have brought closure to the low cost GDS solution offering."

25.     The Contractual Restraint took away the Airlines' ability to offer discounted fares or to steer consumers to cheaper, more efficient channels of distribution; it eliminated price competition between Defendants; it allowed Defendants to secure the very important business of travel agents through exorbitant kickbacks or incentives. These features of the Contractual Restraint allowed Defendants to maintain their dominance over the Airlines so that they could extract supracompetitive GDS fees while blocking new entrants and competitive threats.

26.     The Airlines could not break the cartel in the 2006 contract negotiations, but they had another opportunity in 2009 and 2010, as GDS agreements came up for renegotiation. As the Airlines began charging separately for services like baggage check, Wi-Fi and premium seats, the Airlines again, in theory, could use content as leverage for lower GDS fees.  With these ancillary products unbundled from ticket prices, the Airlines had the ability to determine when, to whom, and under what circumstances this discrete content would be distributed.

27.     Defendants again responded by colluding. Fearing that unilateral negotiations with Airlines over ancillary content would "open the floodgates," Sabre suggested that during the upcoming 2009 National Business Travel Association conference, a "meeting with all the players to firm up our strategy."

500390.1

28.     Working to "regroup among the 3 GDS to align on the approach" to negate the Airlines' potential negotiating leverage, Defendants met with each other to exchange marketing strategy and pricing information.  For example, fearing that "a mistake by any of the GDS could harm our business irrevocably" and that they needed for "all the GDS [to] stand firm," Sabre decided to "speak to Amadeus about their strategy."  Amadeus "changed [its] mind after [Sabre] highlighted the possible risks."

29.     In a classic example of cartel behavior, when Travelport had trouble negotiating new contracts with two airlines, Sabre instructed its sales people "not to exploit this"; "I don't want us in any way taking advantage of this."

30.     While Sabre had Travelport's back, Travelport was internally circulating an email titled, "CONFIDENTIAL Sabre Strategy on Pricing Optional Services."  In that email, a Travelport executive disclosed that after sitting on an industry panel discussion with a Sabre executive, the two spoke in detail about Sabre's plans for pricing ancillary products and negotiating for full content.

31.     One month later at another industry conference, Amadeus discussed its pricing strategy with a Sabre executive.  After being briefed on the pricing details, her boss noted that he too had exchanged price information with Amadeus, but that she should "be very careful" to "not talk to anyone about this."  Nevertheless, that evening, that same Sabre executive dined with two Travelport executives, concluding an industry conference she found to be "VERY interesting."

32.     Before another industry conference, a Sabre executive wanted to find out what Travelport could do to help Sabre minimize the use of multi-GDSs by travel agencies, which caused competitive pricing pressure. Asking whether his colleague had had "[a]ny luck reaching

9

out to Tport execs," the executive noted they were on an industry panel at a coming industry conference, and said "If I see him, I will chat with him about this."

33.     According to research by professors at Harvard Business School and the National University of Singapore Department of Economics, "As airlines' GDS contracts came up for renewal, GDSs sought to raise the fees.  By 2012, GDS fees met or exceeded prior levels."

34.     All told, Defendants' collusive Contractual Restraint works to cause a singular antitrust injury: supracompetitive GDS charges paid by all ticket purchasers, either by paying a bloated GDS fee embedded in ticket prices (in the case of travelers booking through travel agents who use GDSs) or by incurring the equivalent of a GDS fee because they have to pay the same ticket price (in the case of travelers who do not use a GDS). The Airlines cannot offer incentives (e.g., discounted fares) or disincentives (surcharges to travel agents using GDS) that would guide passengers to lower-cost channels. By foreclosing these options, the Contractual Restraint immunizes GDS fees against competitive pressure among Defendants themselves and from channels with better content or with lower prices, thus allowing Defendants to maintain the fees at supracompetitive levels.

35.     This court has recognized that "[t]he practice complained of – the imposition of the Contractual Restraints – is anticompetitive because it allegedly restricts price competition in the market for GDS services, thus forcing US Airways to pay above-market prices, and possibly increasing ticket prices across the board. The supracompetitive fees complained of are classic 'overcharge' damages."

36.     The Airlines passed on the supracompetitive price of GDS services to Plaintiffs and other Class members.  A 2014 report prepared for the DOT's economic consulting firm found that ***"[t]he contract provision effectively prohibits the carrier from offering a fare on its***

10

*own website without the cost of the GDS fees built-in*."  (Emphasis added.) An economist retained by US Airways analyzed US Airways' fares and found that it passed the overcharges on to consumers through higher ticket prices, stating that the supracompetitive GDS fees resulted in *"higher fares to all passengers."*  (Emphasis added.)

37.     To halt Defendants' anticompetitive practices and to obtain compensation for paying inflated airfares because of supracompetitive GDS fees, Plaintiffs bring this action under Section 1 of the Sherman Act, 15 U.S.C. § 1, Section 16 of the Clayton Act, 15 U.S.C. § 26 and state antitrust and consumer protection laws on behalf of themselves and all other similarly situated persons. Plaintiffs seek treble damages for injuries and damages they have suffered as a result of Defendants' anticompetitive practices, equitable relief in the form of an injunction prohibiting Defendants from engaging in any further illegal conduct, and the costs of this suit, including reasonable attorneys' fees.

38.     Except with respect to the allegations relating to them personally, Plaintiffs' allegations are based on information and belief.

## II.     JURISDICTION AND VENUE

39.     This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1337(a) and 1367.

40.     This Court has further jurisdiction over this action pursuant to 28 U.S.C. § 1332(d) because this is a class action involving common questions of law or fact in which the aggregate amount in controversy exceeds $5,000,000, there are more than one hundred members of the class, and at least one member of the class is a citizen of a state different from that of one of the Defendants.

41.     Venue is proper in this judicial district pursuant to 15 U.S.C. §§ 15 and 22, and 28 U.S.C. § 1391(b) and (c), in that at least one Defendant resides in, is licensed to do business in or is doing business in this judicial district.

## III.    PARTIES

### A.      Plaintiffs.

42.     Plaintiff Bruce A. Kolman is a resident of Windsor, California and during the Class Period, purchased online both directly and not directly from an Airline, for use and not for resale, tickets for travel on at least U.S. Airways, Southwest, United, and Virgin America.

43.     Plaintiff Jeanne Rice is a resident of Boca Raton, Florida and during the Class Period, purchased online both directly and not directly from an Airline, for use and not for resale, tickets for travel on at least Virgin America, Southwest, Delta and United.

44.     Plaintiff Stephen P. Moore is a resident of Brewster, New York and during the Class Period, purchased online both directly and not directly from an Airline, for use and not for resale, tickets for travel on at least Jet Blue and Delta.

### B.      Defendants.

45.     Defendant Amadeus IT Group, S.A. ("Amadeus IT") is a corporation organized, existing and doing business under the laws of Spain having its headquarters at Salvador de Madariaga 1, Madrid, Spain.

46.     Defendant Amadeus North America, Inc. ("Amadeus NA") is a Delaware corporation having its principal executive offices at 3470 NW 82nd Ave., Suite 1000, Miami, Florida.

47.     Defendant Amadeus Americas, Inc. ("Amadeus Americas") is a Delaware corporation having its principal executive offices at 3470 NW 82nd Ave., Suite 1000, Miami, Florida.

48.     Defendants Amadeus IT, Amadeus NA, and Amadeus Americas are referred to here collectively as "Amadeus."

49.     During the relevant time period, Amadeus has owned and operated the Amadeus Global Distribution System ("Amadeus GDS"), through which it has provided GDS services to the Airlines and other air carriers operating to, from, and within the United States and entered into agreements with one or more of the Airlines with respect to those services.

50.     Sabre Corporation, formerly known as Sabre Holdings Corporation, is a Delaware corporation, having its principal executive offices at 3150 Sabre Drive, Southlake, Texas. Sabre Corporation is the sole owner of Sabre Holdings Corporation ("Sabre Holdings").

51.     Defendant Sabre Holdings Corporation ("Sabre Holdings") is a Delaware corporation having principal executive offices at 3150 Sabre Drive, Southlake, Texas. Sabre Holdings wholly owns and controls Sabre GLBL Inc. ("Sabre GLBL"), its principal operating subsidiary and sole direct subsidiary.

52.     Defendant Sabre GLBL Inc. is a Delaware corporation having principal executive offices at 3150 Sabre Drive, Southlake, Texas.

53.     Defendant Sabre Travel International Limited ("Sabre Ltd.") is an Irish corporation with its principal place of business at 3150 Sabre Drive, Southlake, Texas.

54.     Defendants Sabre Corporation, Sabre Holdings, Sabre GLBL, and Sabre Ltd. operate as a single enterprise, with Sabre Holdings responsible for, among other things, negotiating and contracting with the Airlines and other air carriers on behalf of Sabre GLBL and directing their actions with respect to all agreements with the Airlines.

55.     Defendants Sabre Corporation, Sabre Holdings, Sabre GLBL and Sabre Ltd. are referred to collectively here as "Sabre."

13

56.     During the relevant time period, Sabre has owned and operated the Sabre Global Distribution System ("Sabre GDS"), through which it has provided GDS services to the Airlines and other air carriers operating to, from, and within the United States and entered into agreements with one or more of the Airlines with respect to those services.

57.     Defendant Travelport Worldwide Limited ("Travelport Ltd.") is a Bermuda corporation having its principal executive offices at Axis One, Axis Park Langley, Berkshire, United Kingdom.

58.     Travelport LP d/b/a Travelport is a Delaware corporation having its principal executive offices at 300 Galleria Parkway, Atlanta, Georgia.

59.     Travelport Ltd. and Travelport LP are referred to collectively as "Travelport."

60.     During the relevant time period, Travelport Ltd. has owned and operated the Galileo and Worldspan global distribution systems ("Travelport GDSs"), through which it has provided GDS services to the Airlines and other air carriers operating to, from, and within the United States and entered into agreements with one or more of the Airlines with respect to those services.

61.     Various other firms, corporations and individuals not named as Defendants here, participated in the conspiracy alleged herein and performed acts in furtherance of the conspiracy.

14

## IV.    THE GDS PRODUCT AND GEOGRAPHIC MARKET.

62.    GDSs function in a two-sided market as an intermediary between the Airlines (the supplier side of the market) and travel agents (the GDS subscriber side of the GDS market). In the U.S., Defendants claim at least a 99% aggregate share of the GDS market, with similar reach globally. Sabre has the largest market share in the United States, followed by Travelport and then Amadeus.  In Europe, however, Amadeus has the largest market share.

63.    In the broader airline ticket distribution segment, Defendants control 64-67% of the market as measured by revenue. Because Defendants keep their GDS fees tightly under wraps, Plaintiffs do not know precisely what the per segment GDS fees are. Based on limited publicly available information, GDS fees during the relevant time period have been in the neighborhood of $3.50 to $5.00 per flight segment. In the 2004-2005 timeframe, United was reportedly paying about $12 per ticket in GDS fees and Northwest was paying about $12.50 per ticket. Assuming an average of 2.8 flight segments per ticket, a statistic at least one industry source has cited, these fees ranged from about to $4.29 to $4.64 per segment.  In spite of ever-decreasing technology costs and the rise of the Internet, in 2012, according to an industry consultant, "the expert consensus seems to be that the GDSs charge about $3.50 per flight segment, so that, for example, a trip from Washington to New Orleans with a connection in Atlanta will consist of four segments that cost the airline a total of about $14 in GDS fees."

64.    It is estimated that GDSs collect approximately $2.4 billion in annual GDS fees. American's GDS fees alone were approximately $400 million in 2003, and as of 2005, United was spending about $250 million annually on GDS fees. In 2010, Travelport enjoyed net profits of $314 million and Amadeus booked a profit of $976 million.

65.    The geographic market is the United States.

15

## V.     FACTS GIVING RISE TO CLAIMS FOR RELIEF

### A.     History of the GDS Market

1.     <u>1960s-1984: The Creation and Evolution of GDSs.</u>

66.     Before the advent of computerized reservation systems in 1964, searching for flights and fares and purchasing tickets was time-consuming and cumbersome. To book flights for their business clients, travel agents had to separately contact each airline to inquire about available flights. Originally, the Airlines manually searched for flight information on paper before responding to the request. Later, they used crude mechanical devices.

67.     To streamline the process, the Airlines developed automated reservation systems. In 1960, American Airlines introduced the first computerized reservation system, which it named SABRE (an acronym for Semi-Automatic Business Research Environment). Other airlines followed by implementing their own computer systems. Initially, the Airlines only used the systems internally to accelerate their responses to travel agents. Eventually, they opened up access to travel agents, who could then book flights directly.

68.     Once computerized reservation systems became established, the Airlines began sharing content with each other and making it available on their individual systems. This step eliminated the need for travel agents to separately access each airline's system.

2.     <u>1984-December 2003: GDS Regulation by the Department of Transportation.</u>

a.     DOT regulations require content and fee parity.

69.     After the Airlines began sharing content with each other, they began using their systems for competitive advantage. To steer travelers toward their own flights, they adopted practices such as "display bias," which featured the owner's content more prominently, and "fee discrimination," which charged a booking fee for each flight segment purchased from another

16

airline.

70.     To halt those practices, the DOT intervened and began regulating the GDS market in 1984. DOT regulations required GDSs to charge the same fees to all the Airlines and required the Airlines to offer the same content to all GDSs. Because of these anti-discrimination rules, GDSs and the Airlines did not negotiate with each other individually over fees or content to gain a competitive advantage: an airline could not bargain for lower fees and a GDS could not bargain for more content.

71.     Because many travel agents were single-homing (i.e., subscribing to only one GDS), these rules meant that each airline had to participate in every GDSs in order to make its fares accessible to all travel agencies.

72.     In response to this mandatory GDS participation, the Airlines eventually divested themselves of all GDS ownership, a process that was completed by 2003. American sold its remaining interest in Sabre in March 2000. United's ownership of the GDS it launched, Apollo (which became Galileo in 1987), diminished with two public offerings before ending when the system was acquired in 2001 by Cendant Corporation, which was not affiliated with any airline. And Worldspan, formed in 1990 by combining GDSs owned by TWA and Delta, was sold in July 2003 by then-owners Delta, Northwest and American (which had acquired TWA). None of the Airlines had owned any interest in Amadeus.

                    b.     DOT regulations allowed the Airlines to withhold content.

73.     Although the DOT's rules mandated fee and content parity, they allowed the Airlines to bargain with GDSs on price in a very important way. The Airlines were not required to give GDSs access to all of their content. They were allowed to withhold fares as long as they withheld the same fares from all GDSs, and they were permitted to price those fares any way they wanted. Accordingly, the Airlines could offer lower fares through alternative channels—for

example, webfares on their own websites or through online travel agencies ("OTA") that did not use GDSs, once they began sprouting up.

74.     During the deregulation hearings before the DOT, Sabre's economic experts recognized the power of this content control. In an analysis submitted to the DOT, they noted that "marketplace changes" brought on by the appearance of innovative booking technologies "have increased airlines' bargaining leverage" over GDSs. The source of that new power, the experts said, was the Airlines' ability to withhold content or even withdraw completely from a GDS and divert it to an airline's own website or other direct-connect platform. The DOT envisioned that this flexibility in a deregulated market would "constrain the ability of the [GDS] to charge an excessive booking fee."

75.     Sabre's experts added that the harm to an airline from delisting in 2003 would be less than it would have been in 1984, while the harm to a GDS could be catastrophic. According to Sabre's experts, clients of a travel agency whose GDS no longer had access to an airline's relevant content would switch to an agency that did. Moreover, agents would switch to a different GDS and that switch "would [be] for all their flights, not just those on the delisted carrier."

76.     In explaining how they envisioned a deregulated market would work, to avoid the loss of access to some fares, Sabre's experts explained that some travel agencies would begin booking flights with competing web-based products, others would refuse to renew their contracts with the delisting GDS, and still others might switch GDSs immediately because the other Defendants would seize the opportunity by offering to pay an agent's early termination cost. "As a result, the delisting [GDS] would quickly lose substantial revenue and would find it very difficult to attract travel agency subscribers in the future."

500390.1

77.      In a press release applauding the end of DOT regulation, David Schwarte, Sabre

Holdings' executive vice president and general counsel, said:

> Traditional antitrust enforcement and consumer protection laws should be
> relied on for this industry just as it is for virtually all others, to ensure that
> consumers receive the benefits of a highly competitive marketplace.  Open
> competition in this dynamic market will produce an outcome far better for
> consumers than governmental central planning.

        c.      Defendants and the Airlines negotiate the last GDS agreements of
                the regulatory era.

78.      As this century dawned and e-commerce rapidly grew along with improving web

technology, webfares and OTAs had become serious competitive threats to Defendants. These

lower priced, direct-connect tickets were diverting more and more bookings from GDSs, cutting

into both Defendants' fee revenue and the incentive payments they made to and travel agents.

79.      As the DOT moved toward deregulation of GDSs and Defendants' agreements

with the Airlines came up for renewal, Defendants made efforts to compete with discounted fares

by offering lower GDS fees in return for full content. For example, in October 2002, Sabre

introduced what it called a "Direct Connect Availability (DCA) 3-Year Pricing Option," which

offered a 12.5% fee discount to airlines that agreed to provide full content for three years. Other

GDSs followed with similar discount options.

        3.      <u>January 2004: The DOT Deregulates GDSs Despite Concerns About
                Potential Abuse of Market Power.</u>

80.      The DOT allowed its GDS regulations to expire on January 31, 2004, despite

finding that Defendants "continue to have market power over airlines . . . and that [Defendants]

could engage in practices that could unreasonably preserve their market power." The DOT

specifically noted that single-homing by travel agents enhanced Defendants' market power by

making the Airlines' participation in all GDSs essential to remain financially viable. In

comments submitted to the DOT, the DOJ concurred, concluding that "[t]he airlines' [GDS]

19

divestitures leave unaffected the incentive and ability of [Defendants] to fully exercise their market power in nonstrategic ways."

81.     The DOT nevertheless decided to deregulate the GDS industry because it determined that ending the regulatory scheme "will enable each system and each airline to bargain over the terms on which [GDS] services should be provided."

82.     The DOT rested this conclusion on several assumptions that Defendants' collusion later thwarted. First, the DOT expected online travel agents to constrain Defendants' market power by competing vigorously with GDSs.

83.     Second, the DOT believed that the Airlines' ability to sell fares more efficiently through alternative channels, such as their own websites and direct-connection platforms developed by GNEs, would bolster their bargaining power with Defendants. According to the DOT, the Airlines would hold GDSs in check by "developing direct connection technologies which enable bookings to be made directly with an airline's internal reservations systems, bypassing [GDSs]."

84.     Third, the DOT assumed that the Airlines would be able to control access to their content, not be compelled to furnish all of it to the GDSs. The DOT believed that "airlines' ability to change their participation levels and their control over access to webfares is reducing the [GDS] systems' market power." For example, the DOT envisioned the Airlines being able to "use their control over webfares to win better terms for [GDS] participation."

85.     Sabre did nothing to disabuse the DOT of that assumption. To the contrary, Sabre assured the DOT that they did not have sufficient power to offer "take it or leave it" full content terms. Sabre also stated in its 2004 10-K that deregulation would require it to "offer airlines a choice of multiple pricing schedules," to implement "creative ways to market and

promote airline services, thus enhancing our value proposition for airlines" and to develop the "flexibility to tailor specific proposals to individual airlines." However, in future negotiations agreements with the Airlines after deregulation, Sabre did no such thing.

86.     Fourth, the DOT anticipated that travel agents would win favorable contracts with Defendants, enabling them to easily switch GDSs.

87.     Finally, the DOT placed trust in antitrust enforcement to effectively police the market, stating that "[v]igorous enforcement of antitrust policy is the discipline by which competition can remain free and markets can operate in a healthy fashion." Since deregulation, there has been no government enforcement of the antitrust laws against Defendants, but this is not the first time Defendants have been sued for the conduct of the type alleged here. American sued Sabre and Travelport alleging antitrust violations, and US Airways filed an antitrust lawsuit against Sabre. Both Sabre and Travelport settled American's claims: Sabre settled for $347 million in cash payments and credit for future technology services, and Travelport settled for an undisclosed amount of cash to be paid over a period of years. US Airways' lawsuit was recently set for an October 2015 trial after the bulk of its claims survived Sabre's motion for summary judgment and two motions to dismiss.

88.     The 2004 deregulation appeared to leave the Airlines with new leverage in negotiating GDS content and fees. The Airlines were no longer required to provide the same content to all GDSs. For the first time, the Airlines were empowered to negotiate content and fees separately with each GDS, playing one GDS against another by offering content in exchange for lower fees. For example, a carrier could offer fares exclusively to each GDS and choose the lowest bidder. Additionally, there was no longer any doubt that the Airlines could surcharge fares or discount fares.

89.     In a competitive market the Airlines could respond to, and thus deter, anticompetitive increases in GDS fees. First, the Airlines could withdraw specific content from any GDS that attempts to increase its fees. For example, an airline could make its lowest fares available only through rival GDSs and/or through the airline's website. Second, the Airlines could impose surcharges on travel agents that book through a particular "non-preferred" GDS.

90.     By using these bargaining tools, an airline could make the high-cost GDS less attractive to travel agents and a low-cost GDS more attractive, inducing some travel agents to switch to the lowest cost GDSs. If a travel agent were to switch, the GDS would lose not only the bookings on that airline, but also the bookings made by the travel agent on all other airlines, causing a substantial loss of revenues for the GDS. Avoiding such losses provides a deterrent to anticompetitive prices which is the hallmark of a properly functioning competitive market.

91.     As Sabre's own economist acknowledged in comments submitted to the DOT when it was contemplating possible deregulation, the Airlines' ability to withhold content was their strongest leverage in negotiations. Aware that deregulation would give the Airlines this bargaining power, Sabre's CEO candidly said his company's GDS strategy before deregulation was to "milk the cash cow" for as long as possible.

92.     In a healthy and competitive market after deregulation, the Airlines' newly acquired leverage combined with the other factors cited by the DOT would have diminished Defendants' market power by pitting GDSs and alternative distribution avenues against each other, assuring that GDS fees were competitive. But Defendants' conspiracy destroyed the Airlines' leverage and nullified competitive forces.

**B.     GDSs Are Increasingly Threatened by Competition from Innovative Alternatives for Booking Air Travel.**

93.     Before the Contractual Restraint was implemented, the advent of the Internet and more sophisticated electronic reservation systems presented serious competitive threats to Defendants. Chief among them were the Airlines' own websites, and sophisticated web-based platforms offered by third parties, both of which allowed travel agents to book directly with the Airlines. Although these distribution channels operated differently, they all used more efficient platforms than GDSs, offering lower booking fees (including no booking fees if the Airlines own website was the channel) that undercut GDS pricing.

94.     The channels from which a customer could obtain information about Airline flights and fares  at time of the formation of the conspiracy are depicted in the following chart.



95.     New competition was gearing up. The Airlines' direct distribution through their own websites was nearly doubling year over year and other alternatives were also beginning to eat into Defendants' revenue. Those threats to the GDSs' oligopoly are detailed below.

1.     The Alternatives to GDSs

a.     The Airlines' own websites

96.     Eliminating the middleman was an obvious way for the Airlines to reduce their booking costs. With the advent of e-commerce, the easiest and least expensive way for the Airlines to reduce their booking costs was by operating their own websites. Developing websites was expensive and time-consuming, but once launched they began to divert bookings from the GDSs. In 2000, airline websites' share of ticket purchases by revenue was less than 5%; by 2005, it had climbed to over 20%.

97.     The Airlines had a huge incentive to make these websites work. In 2002, for example, as the websites were starting to grow, booking travel though a traditional travel agent could cost an airline 15% to 20% of the revenue it generated, between GDS fees, travel agent override commissions and credit card costs; in sharp contrast, the cost of travel booked directly on a carrier's website could be as little as 3% to 5%. To draw more traffic to the sites, the Airlines began rewarding customers with lower fares and additional incentives, such as premium seat selection, and bonus frequent flyer mileage.

b.     GNEs

98.     GNEs were also challenging Defendants. These prospective entrants, such as G2 SwitchWorks ("G2") and ITA Software ("ITA"), had developed platforms using advanced technology to connect the Airlines and travel agents at a fraction of what GDSs charged. United estimated at one point that by using G2 and ITA technology it could reduce the cost of booking a ticket from the $12 then being spent to about $1.

24

99.     Demonstrating the determination of the Airlines to cut distribution costs, United held a summit in early 2005 titled "Letting the GNE Out of the Bottle."  Corporate travel buyers, travel agents and other GDS users were invited to United's headquarters to discuss alternative distribution. G2 and ITA were featured vendors who presented their distribution vision. The Airlines wanted travel agents to discover and appreciate the potential of this new species of distribution platform. A few months later, Garber, a travel agency with over 500 corporate accounts, announced that it would begin using ITA to book flights for its corporate customers who flew United.

100.     Beyond cost savings, however, GNEs also promised to revolutionize content distribution.  The GNEs were internet-based access and distribution systems that did not require data to be stored internally, as GDSs did. Rather, GNEs search numerous supplier travel sites (airlines, hotels, rental car, cruise lines, tour operators) as well as OTAs (*e.g.*, Expedia, Travelocity, Orbitz) simultaneously to create a virtual data set that is presented to agency customers. The GNEs could then make bookings directly with the suppliers and give the customer a super-itinerary from the multiple supplier sites.

101.     GNEs were developing capabilities to allow the Airlines to push "ancillary services," which consist of amenities valued by passengers such as priority seating, early boarding, upgrades for in-flight services and a host of other options. Ancillary services were highly-valued by business travelers, and were poised to become an increasing source of airline revenue.

102.     Defendants were especially vulnerable to these advancements because their anachronistic GDSs are incapable of the same kind of service customizing. As one travel

25

publication observed, GDSs "are speed bumps in the paths of the airlines' a la carte dreams and the GDSs that are struggling to accommodate both ends of the distribution channel."

103.    Another serious deficiency of Defendants' GDSs is that they cannot easily be updated and improved. This was a source of frustration to David Gross, Sabre's Senior Vice President of Global Airline Distribution ("Gross"), who complained:

> We have failed to deliver squat in the two plus years [Air Canada] has implemented their technology. Their web is really good and [we] can't even develop and implement fare families, and graphical hover over. … Seems to me that we are not built for speed, agility and innovation. That seems like our problem, no?

104.    Aggravating Defendants' fears of competition from other sources were efforts by the Airlines to foster the market penetration of the GNEs. For example, in January 2005, United announced plans to offer a per-ticket incentive of up to $5 to travel agents that began using GNEs such as G2 and ITA. In July 2005, G2 announced that five major airlines had agreed to pre-pay for up to eight million tickets it processed.

105.    The Airlines were willing to offer special content to the GNEs. "United hinted it may offer better fares through new distribution systems," noted Bill Tech, president and CEO of Omaha, Nebraska-based Travel & Transport. "If they do, we may need to be a part of it to get those special fares. We have to be prepared for that." AirTran also offered to give G2 access to fares and services that would be unavailable to the GDSs.

106.    The Airlines' support of GNEs shows how committed the Airlines were to investing capital and resources in new distribution technology, which was a key means for the Airlines to optimize use of their customers' information—such as loyalty figures and preferences—as well as predictive modeling, trends and real-time trip conditions—such as

delays or weather—to customize their services based on what a traveler was likely to want at any given time.

107.     Another GNE, FareLogix, which was led by the former CEO of Amadeus North America, was also coming to the fore. Conceived as a "bridging solution to enable agencies to better manage inventory sourcing from multiple channels," FareLogix also offered an attractive alternative to GDSs.

c.     OTAs

108.     Yet another player in the market was the OTA, a booking platform that the DOT and the DOJ had hoped would effectively compete with GDSs.  Although some OTAs were owned by Defendants and used GDSs to book tickets, other new OTAs created a serious competitive threat.  For example, Orbitz, which was financed by a number of airlines, used ITA software called "Supplier link" to operate easily accessible websites and call centers that offered aggregated content and provided broad search results from many airlines. These airlines offered differentiated content, usually webfares, to Orbitz. The cost to the Airlines to have tickets booked through OTAs was substantially lower than GDS fees. American, for example, announced that it expected to save up to 77% per ticket.

d.     Meta-search engines

109.     Meta-search engines, such as Kayak, provide consumers with search functionality that is similar to OTAs.  Unlike OTAs, meta-search engines do not facilitate booking of airline tickets.  Rather, they refer consumers via a link in the search results to the Airlines' websites.  Because each airline can control access to its fare information, meta-search engines contract with the Airlines to obtain the content.  In return for access to the Airlines' content and a referral fee, meta-search companies direct consumers to the Airlines' websites to complete their purchase.  This combination of a meta-search engine and an airline's website

27

could be used to compare fee information and then book on the best choice, while avoiding GDS fees altogether.

e.      Brick-and-mortar travel agencies

110.     Traditional travel agencies were developing their own booking systems as well. Travel agent giants like WorldTravel BTI, American Express and Carlson Wagonlit (CWT) in particular were developing and implementing direct-connection platforms. For example, by 2003, CWT had launched DirectNet, which used a Navitaire system to link American, Continental, Delta, and United directly to CWT's agents and clients.  CWT said it was keeping all options open to counter potential content fragmentation, noting that "G2 gives us enhancements we don't have today" and that it is a "low-risk solution." WorldTravel BTI said "we would have been fools not to hear airlines shots across the bow" and noted that it was looking at other content aggregators, stating that "G2 is making Navitaire better. Suppliers like that because it gets solutions to market quicker." American Express also developed a multisource distribution platform called Travelbahn.

111.     According to Navitaire, tickets issued through DirectNet cost an airline $3 or less, compared to "typical GDS-issued tickets that on average costs [sic] an airline between $10 and $15."  Continental's senior vice president of marketing similarly observed that DirectNet "dramatically drives down the costs of distribution for us, while providing our customers with an efficient, cutting-edge booking tool."

112.     Sabre's own research in 2004 found that travel agents were beginning to use "[c]ertain 3rd party tools that enable booking and passive booking of SouthWest [sic] fares into GDS competitors [and] charge $1.00 per transaction" and that some agencies were "staffing a web fares desk, through which 10% of all bookings are shopped."  Sabre noted that "[t]he more agencies obtain content outside of the GDS, the less reliant agencies are upon GDS."

28

2.       Defendants Fear Channel Shifting Will End Their Reign Over the GDS
         Market.

113.    The GNEs offered the technology that the DOT and the DOJ had expected to

compete with GDSs on a level playing field—Defendants' worst fear. As a Sabre senior vice

president later phrased it: "any kind of fragmentation is a bad thing."

114.    Having been co-opted by Defendants' lucrative incentive payments, travel

agencies had good reason to prefer the status quo. Recognizing the virtues of the new channels,

however, the agents were prepared to adapt to a market that gave them a variety of options to

best serve the interests of their clients. These versatile aggregation platforms appealed to agents

because they were easier to use and operated more efficiently than the clumsy GDSs. Agents did

not view full content from a single source (i.e., GDSs) as essential to their businesses; they

would still have full access to airline content because of the new aggregation capabilities.

115.    This was not the first time travel agents would reinvent their business model.

They once functioned as agents of the Airlines, which paid them large commissions on ticket

sales. In 1994, when the Airlines started reducing these commissions in the U.S. market, the

agents adapted by introducing service fees, and, in some instances, by redefining their business

model to become travel management companies (TMC) that provided a number of services to

their corporate clients.

116.    Travel agents recognized the transformation underway and had begun

implementing technology that could access multiple sources of inventory simultaneously,

making GDSs one of many sources of information, no longer the exclusive source. Sabre's

internal research noted as a problematic trend that "Several global TMCs [identified as American

Express, BCD and CWT] have products in the market that aggregate and allow booking of

29

content received from a variety of sources. Multisourced solutions are seen as the answer to the corporation/TMC need for full content."

117.     Like the Airlines, travel agencies were not looking to bypass (or "disintermediate") GDSs completely; they wanted the flexibility to enhance their efficiency and better serve their customers by selecting which "preferred alternative supplier" to use for a particular booking. The president of one of the largest TMCs expressed the agents' perspective this way: "How much we use the GDSs in the future depends on their efficiency and their ability to deliver content. If our customer needs access to something that is not on a GDS, we can deliver it. It should be directed to the most efficient channel."

118.     Like travel agencies, the Airlines also had room for the GDSs in their business plans if they were competitively priced. They were striving to divert bookings from GDSs to reduce their distribution costs, not to put Defendants out of business. But for travelers who still valued travel agents—whether because of travel restrictions in their business or because they just wanted personal services—the Airlines wanted to make those transactions less costly.

119.     Defendants were painfully aware of the damage that new competition could inflict on them. As Sabre stated, now "airlines have more flexibility to limit their participation in our Sabre GDS, or to not participate. . . . If our access to supplier-provided content or features were to be diminished relative to our competitors, our business could be materially adversely affected."

120.     Defendants considered G2 a "credible technical platform" and that "G2 and 1U [ITA] are likely to overcome technical and operational barriers to entry." Defendants were acutely aware that, as Sabre put it, "[t]hese alternative travel distribution systems may have the

30

effect of diverting customers from our online sites and our Sabre GDS, putting pressure on our revenues, pricing and operating margins."

121.    Defendants also feared the channel shift to OTAs, even though OTAs used GDSs. In a March 18, 2005 article posted by a leading industry newsletter, Sabre Holdings' president expressed his concern at an industry conference called The Masters Program that OTAs might drag GDSs into "a completely transparent channel that will spiral prices downwards." This fear of transparency is telling.

122.    Defendants had a strong motive to conspire. Approximately 320 million tickets were sold in 2013, with an approximate average of 2.5 segments per ticket.  Roughly two-thirds of tickets were sold via GDS-mediated channels, and at an average cost of $4.50 per segment, airlines spent roughly $2.4 billion per year in GDS fees.  Non GDS-channel costs are reportedly about $1.20 per segment.

123.    In short, in the wake of deregulation, Defendants perceived the Airlines' content leverage and the new booking platforms and resulting market fragmentation as a clear and present danger. Defendants were desperate to undermine the Airlines' content leverage, GNEs' technology advantages and special webfares that were beginning to cause "channel shift" away from the GDSs. In Defendants' own words, they needed to "be protected by [their] agreement[s] not by the technology." And so, their cartel was born.

**C.      Defendants Collude to Thwart Burgeoning Competition.**

1.      Sabre Forms Project Atlas to Combat the Airlines' Content Leverage.

124.    The question publicly posed by Sabre's Chief Marketing Officer was whether Defendants would tolerate content fragmentation or "would the *industry players work together*" to oppose it. (Emphasis added.) Defendants' answer was to work together.

31

125. And so Defendants began formulating measures to avoid content competition. By August 2002, Sabre had formed a task force called Project Atlas to assess the growing threats and propose ways to neutralize them. As Sabre put it, the objective was to exclude platforms that threatened "to disintermediate the GDS and to lower GDS fees." In particular, Project Atlas took aim at the Airlines' use of the Internet to offer exclusive webfares. The Project Atlas team confirmed Defendants' fear that the Airlines' online booking sites were important not only to leisure travelers but also to the travel agents who were the lifeblood of GDSs. It found that "[a]gencies value access to a wide range of content, especially webfares."

126. As Project Atlas explained, "The more agencies obtain content outside the GDS, the less reliant agencies are upon GDS." To stem that agent defection, Project Atlas proposed using what it called a "content lever," which would "[e]ncourage[] a carrier to list all content in the GDSs and would penalize those that do not" and "[provide[] an inhibitor to a future alternate 'content play' by carriers[.]"

127. Simply stated, the plan was to extinguish the Airlines' fare discounting advantage by demanding that they offer the same fares on GDSs.

2. Sabre Launches Project Nike to Forestall Competition From New Entrants: the "Full-Content" Strategy.

128. Sabre later convened a second task force called "Project Nike," which was tasked with assessing the threat posed by GNEs and developing countermeasures. In an October 4, 2004 presentation, the Project Nike steering committee reported that G2 is a "credible technical platform" and that "G2 and 1U [ITA] are likely to overcome technical and operational barriers to entry." The GDSs were most concerned about "content and service concession to favor low cost channels," and were determined to prevent it.

129.     Proceeding from the assumption that the GNEs would charge the Airlines $3 per ticket, Project Nike estimated a 50% reduction in GDS fees, redirecting hundreds of millions in revenue to the GNEs. Accordingly, Project Nike concluded that "G2 (and likely [1U]) pose substantive threats to the traditional GDS model."

130.     Project Nike identified a vulnerability in the GNEs' entry strategy: it was "primarily dependent on the level of airline support they receive." In other words, if the GNEs could not offer travel agents exclusive content or preferred status (i.e., agents would not be surcharged for GNE use), they would likely get no traction in the subscriber side of the market. Accordingly, Project Nike concluded that Sabre should thwart the GNEs by using their upcoming 2006 GDS contract negotiations to eliminate the Airlines' support of the GNEs. To that end, Project Nike recommended that Sabre negotiate agreements ensuring that the Airlines could not "game the system" through "[c]ommissions," "[d]irect connects," "[a]gency portals," and "agency ticketing charges [*i.e.*, surcharges]."

131.     Project Nike concluded that the best defense was to ensure that Sabre was able to offer the same content at the same price (i.e. no surcharge) as the upstart GNEs. Documents memorializing Project Nike's discussions state that Sabre's contracts with the Airlines were "the tactical vehicle Sabre has chosen to achieve its strategic goals." Project Nike identified specific changes to the language in Sabre's next GDS contracts, including these:

      a.      "Full content required for Sabre subscribers and their customers"; and

      b.      "Parity of Sabre subscribers with all other reservation outlets (prior contract only included parity with other GDS)."

**D.     2006: Defendants Implement Their Post-Deregulation Strategy by Jointly Demanding Full Content and Prohibiting the Airlines from Offering Lower Fares Elsewhere.**

     1.     <u>When Their GDS Agreements Expire, the Airlines Attempt to Stimulate Competition Among GDSs by Surcharging.</u>

132.    The Airlines' first opportunity to exercise the perceived bargaining power following deregulation arose during negotiations for renewal of GDS contracts that were set to expire in 2006. The stakes were very high.

133.    Although the use of alternative distribution channels had been steadily growing, GDSs continued to generate the majority of air travel dollars.  GDS transactions generated $78 billion that year, representing two thirds of all airline passenger revenues.

134.    Emboldened by the advent of new distribution channels, the Airlines attempted to negotiate agreements with Defendants that would realize the competitive landscape envisioned by the DOT and the DOJ. Some of the Airlines attempted to negotiate lower GDS fees, to surcharge for tickets booked through a GDS, or even to abandon GDSs that refused to allow the Airlines freedom to market their services more efficiently. Others, like United, offered payments of $5 per ticket to travel agencies that booked webfares directly on its website.

135.    American, at the time the largest U.S. carrier, began discussions with Defendants in 2005, demanding that GDS fees be reduced. It also warned Defendants that it would assess a surcharge on travel agencies for tickets booked with a GDS that charged inflated booking fees.

136.    In March 2006, while American (and other Airlines) were still embroiled in heated discussions with Defendants on contract renewals, American rolled out "EveryFare," a program offering travel agents access to certain deeply discounted webfares (later expanded to all fares under American's "Source Premium Policy") previously available only on American's

website. Under American's new policies, however, unless an agent booked the discounted fare on an American "preferred GDS," like G2, it would be assessed a $3.50 per-segment surcharge.

137.    Other airlines, including Delta, Northwest (later merged with Delta) and USAir, introduced similar programs, with important pro-competitive implications. Other things being equal, single-homing agents (those agents that subscribed to only one GDS) would tend to contract with a preferred GDS to avoid surcharges and gain access to additional airline content, and multi-homing agencies would book more tickets on preferred GDSs. Amadeus commissioned a study in 2005-2006 which confirmed that, under such circumstances, a substantial number of travel agents would switch GDSs in the face of surcharges.

138.    Preventing that kind of migration and volume loss was crucial to Defendants, so they felt intense pressure to obtain as much content as possible and to reduce their fees. The leverage that surcharging gives the Airlines thus would have the salutary effects of steering travel agents to lower cost channels, with the resulting competitive pressure reducing GDS fees.

139.    To maximize the competitive benefits of differential surcharging, American appealed to travel agencies to switch from Sabre and Amadeus, which were not preferred American GDSs, to another GDS or G2, which were. Several of Amadeus' key travel agency clients expressed "grave concerns" about surcharging, leading Amadeus to expect that few of its subscribers would renew their agreements. Because each year roughly one-fourth of Amadeus' travel agent subscriber agreements expired, the anticipated defections would begin within a year.

140.    The readiness of travel agencies to bolt to more efficient distribution channels was further evidenced by Amadeus' reaction to surcharges threatened by American and NWA in the run up to the 2006 contracts.  Amadeus claimed that surcharges of $3.50 per segment for

travel agencies using Amadeus over another channel would cause travel agents to "almost certainly switch" to lower cost channels.

> 2.   Defendants Form Their Conspiracy.

141.    Defendants' conspiracy rebuffed those efforts. Together, Defendants substituted a unilateral, uniform position for meaningful bilateral contract negotiations with the Airlines. As stated in sworn testimony by a senior US Airways executive, "we had a gun to our head and were not allowed to offer our customers full content wherever they wanted."

142.    Defendants were publicly discussing their new full content intentions. As reported by an industry publication, in response to reports of new entrants being offered specialized content, "In recent industry dialogue, operators of traditional global distribution systems maintained their commitments to secure comprehensive content."

143.    During contract negotiations, Defendants' key executives had multiple opportunities to discuss their unified position.  For example, in 2005, executives from Sabre, Amadeus and Travelport's then-owner Cendant all spoke at the Travel Commerce Conference & Expo. The theme of the conference was "The Value of Differentiation" and the GDS executives were on a panel titled "GDSs: On fire, or about to flame out?" A notable member of a panel (which again included all three Defendants) at the Masters Conference in February 2005 was John Stow, then president of Sabre's travel agency solutions unit.  In litigation brought by American against Sabre and Travelport, American described Mr. Stow as "an essential witness" because of his email communications on behalf of Sabre with Travelport (filed under seal and remaining so today) calling him a "critical link between the conspirators." The presidents of Sabre and Cendant (Travelport) also attended the June 2005 Travel Distribution Summit.

144.    In early 2006, key executives traveled to other industry conferences, including in March 2006 at the ResExpo, and in April 2006, again including Mr. Stow, at TravelCom.

      3.     <u>Sabre and Amadeus Enter Into the Backstop Agreement to Provide Each Other Airline Content That Only One Receives.</u>

145.     A critical step toward successful execution of Defendants' conspiratorial scheme was the Backstop Agreement that Sabre and Amadeus entered into on March 3, 2006—in the midst of Defendants' negotiations with the Airlines.  Part of a project codenamed "Project Cervantes," the Backstop Agreement was executed by Sabre, Inc.'s Executive Vice President and Chief Marketing Officer, Eric. J. Speck, and Amadeus Global Travel Distribution, S.A.'s Executive Vice President, David V. Jones.

146.     At that time several of the Airlines were attempting to bargain with Defendants for lower GDS fees by doing what buyers do in a competitive market: get the sellers to vie for their business. To do that, the Airlines were using the best leverage they had: content. They told Defendants that they were prepared to withhold content from GDSs, or even to withdraw entirely, unless Defendants were willing to lower their fees.  As discussions between the Airlines and GDSs continued, some large travel agencies were positioning themselves to aggregate content themselves.  "We would be fools not to hear airline shots across the bow," said Dee Runyan, executive vice president at WorldTravel BTI, speaking at an industry conference in May 2005.

147.     Sabre and Amadeus reacted to this threat by removing the Airlines' only tool for negotiating. They entered into the Backstop Agreement, promising to supply each other with any content that any airline provided to only one of them. Sabre described the pact as a "content insurance policy" by which "each GDS is required to serve the role of back-up when requested by the other system."

148.     The Backstop Agreement, which was global in scope, was particularly significant because it allied the world's two dominant GDSs: Sabre, which controlled more than

37

half of the domestic market, and Amadeus, which had a comparable share of the European market.

149.    The Backstop Agreement, signed well after Defendants had begun negotiating with the Airlines (many months into negotiations with American, for example) is compelling evidence that Defendants were failing, as they had in 2003, to obtain from all airlines full content fares at parity with all other distribution channels.

150.    Amadeus admitted under oath that the Backstop Agreement "was entered against the background of American's very public announcements at the time that it might not continue to participate in all the GDSs." According to Sabre, the policy covered only airline content (and not hotel, car rental and other information carried on GDSs) because that was the only segment where "there ha[d] been a lot of noise and rhetoric—including some speculation that an airline may withdraw from one of the systems."

151.    The obvious purpose of the Backstop Agreement was to make sure the GDSs stood as one against the Airlines. As a Sabre senior executive candidly explained in an internal email sent after the agreement was announced, "***Basically, besides increasing the likelihood that Sabre will have access to all the content we need, this agreement takes away any incentive for either GDS to give a super low bkg [booking] fee for exclusivity. Good for the GDS channel (if you are Sabre or Amadeus)***." (Emphasis added.)

152.    The Backstop Agreement is direct evidence of Defendants' agreement not to compete with each other on content or the basis of price.  Along with evidence discussed below, the agreement refutes any suggestion that the Contractual Restraint was merely an innocent parallel response to a common problem. The alliance shows instead that the Contractual

Restraint is the creature of a pact by oligopolists to jointly erect a bulwark against an intensifying competitive siege.

153.     As part of this Backstop Agreement, Sabre and Amadeus agreed to exchange confidential retail GDS fee pricing they charged the Airlines and agreed to pay each other those same fees to the extent they needed to implement the agreement.  In an absurd attempt to inoculate this *written exchange of sensitive pricing data* between competitors, each company promised to keep this sensitive pricing information confidential *within the company* from persons with "any role in setting that GDSs' airlines sales or pricing policies." That two competitors trusted each other with their pricing data is strange indeed. That they neither used it to their competitive advantage and to the Airlines' detriment defies belief.

154.     The Backstop Agreement sent a clear message to travel agents, who were monitoring the negotiations, that they could stick with the GDS technology Defendants paid them to use. "A lot of the airlines are threatening to withdraw content from the [GDS] channel," said the vice president and global leader of the Supplier Relations Group of American Express, which runs the largest travel agency in the country. "This agreement makes it far more difficult to implement that threat."

> 4.     The Cascade of "Full Content" Contracts in the Post-Deregulation World.

155.     Armed with the Backstop Agreement, Defendants implemented their scheme. Despite acknowledging that they would have to be flexible and creative in the face of the Airlines' negotiating power, Defendants jointly demanded substantively identical terms on a take-it-or-leave-it basis during their 2006 contracts negotiations. The Contractual Restraint required the Airlines to share all of their flight information and to make all fares available to all channels at the same price.

39

156.    Defendants had failed to unilaterally impose the Contractual Restraint on its airline customers in the past. For example, Sabre attempted to do so via its so-called Direct Connect Availability 3-Year Pricing Option ("DCA-3") agreements. As United's former distribution strategist explained, the DCA-3 contact allowed United to offer discounted fares to preferred channels:

> . . . there was plenty of opportunity for us to differentiate content tomorrow . . . . Nothing stops the airlines from tomorrow saying that if you have a corporate volume agreement with us, you have a $10 better discount in this channel or every third ticket has a $40 better discount in this channel than in that channel.

157.    The DCA-3 agreements also failed to achieve Sabre's objective of preventing the Airlines from surcharging travel agents who use its GDS. During its 2006 contract negotiations with Sabre, American began imposing a $3.50 per-segment surcharge on travel agents who booked through Sabre. Other airlines, including United, Continental, Delta, Northwest, and US Airways announced surcharges against other GDSs that were "non-preferred" channels for them. Sabre publicly acknowledged that the DCA-3 agreements had failed to stop the Airlines from redirecting their content away from Sabre's GDS channel. As Sabre explained in its 2004 Form 10-K,

> We have also seen continued pressure on Sabre Travel Network revenues resulting from travel bookings being diverted from independent GDS channels toward supplier-controlled channels, individual airline websites and call centers, as well as various other travel distribution websites on the internet.

158.    Not only were the GDS agreements themselves ineffective, but Sabre was also unable to convince most of its airline customers to agree to full content provisions. Sabre reported that, as of December 31, 2004, after it had ceased offering the DCA-3 agreements to airlines, only about half of its global bookings were made pursuant to them. As a result of their

500390.1

failed unilateral attempt to impose full content at parity prices on its airline customers,

Defendants were convinced that concerted action among the GDSs would be required.

159.    Defendants' new take-it-or-leave-it approach was possible only because they

undertook it collusively. Had Defendants not agreed to stand together, none of them would have

dared to issue such an ultimatum. In a competitive market, the other Defendants would have

grabbed market share by offering less restrictive terms and the Airlines would have rejected the

full-content demand, effectively allowing that GDS to run itself out of business.

160.    Defendants' demand for full content at parity with all other channels was

especially distasteful to the Airlines at a time when ancillary services and passenger

personalization were becoming important services to customers and important revenue sources.

Restricting the Airlines to GDSs would curtail this quality improvement to the market and

revenue stream to the Airlines because GDSs lacked the technological capacity to package and

customize this type of content.

161.    Defendants' insistence on the Contractual Restraint was an abrupt and radical

departure from their previous approach to negotiations with the Airlines. Historically—both

under regulation and in the first negotiations after deregulation— the Airlines negotiated GDS

agreements with content flexibility—that is, booking fees were based on the amount of content

furnished by the Airline. This sudden lockstep, historically unprecedented change in GDS

pricing structure, having no legitimate explanation, is evidence of Defendants' collusion.

162.    Sabre has admitted that it refused to compete with other GDSs for content

because the inevitable result would have been a "race to the bottom"—that is, a competitive

spiral that would have severely squeezed GDS fees. Disdaining such competition, Defendants

stuck to their plan. The result was a series of remarkably similar long-term contracts entered into

41

with the Airlines in 2006, all incorporating the Contractual Restraint (the "Full Content Agreements"). With terms ranging from five to seven years, these agreements locked the Airlines into the Contractual Restraint for a relative eternity given the rapid development of alternative distribution platforms.

163.     Shortly after the Backstop Agreement was announced, Defendants announced several full content agreements. On April 3, 2006, Worldspan signed a full content agreement with Continental. Ten days later it announced a contract with United that included "critical content on a long-term basis." Sabre followed by announcing other full content agreements in April and May. On April 21, 2006, Sabre announced a five-year agreement with United that secured access to "all United published fares and inventory" and a "full content agreement" agreement with Delta. On May 15, 2006, Sabre announced a contract with Continental that included "full access to all fare information." Amadeus followed suit and announced two such agreements later in the summer and fall. On July 11, 2006, Amadeus announced a "long-term" agreement with US Airways that gave Amadeus subscribers US Airways' "full range of fares and flights." On September 27, Amadeus and Continental announced an interim agreement to "extend current access to full content" and allow the pair "time to finalize negotiations regarding a long-term content agreement."

164.     As a February 2, 2007 Sabre presentation explained, Defendants used the Contractual Restraint as the "tactical vehicle . . . to achieve [their] strategic goals." The Contractual Restraint wiped away the content advantages of the alternative channels and extinguished price competition among the GDSs and from alternative channels. A Sabre senior executive pronounced the GNEs dead on arrival after the 2006 negotiations:

> We have brought closure to the low cost GDS solution offering per say [*sic*] and the need to take this to the market and respond to the GDS

42

startups (GNEs). With DCA deals now done and the GNEs lack of traction in the market, we do not need a separate low cost GDS in the market.

165.    Unable to penetrate the GDS market, the GNEs folded. ITA left the market to focus on serving as an airline hosting system. G2 was acquired by the same group that owns Sabre, sold its code to Travelport and was liquidated. And Farelogix turned to providing direct connect technology to airlines.

166.    The implementation of Defendants' conspiracy was now complete.

     5.    <u>The Contractual Restraint Forces the Airlines to Furnish All of their Content and Denies the Airlines the Ability to Discount or Surcharge Fares.</u>

167.    As the products of collusion, all of the Full Content Agreements contained a substantially identical Contractual Restraint. The "full content" provision requires the Airlines to make any flight offered through another distribution channel also available for searching and booking on Defendants' GDSs. That clause is coupled with a "parity" provision, which requires the Airlines to offer the GDSs all fares at equivalent prices, and to provide GDS subscribers access to the same types, amounts and levels of products, services, functionality, enhancements, and promotional opportunities that are available on other distribution channels, with no additional costs (like surcharges). Defendants describe their Full Content Agreements innocently as "comprehensive access to the Airlines' fare classes (and freedom from airline surcharges)." More pointedly, in 2014 the DOT has homed in on the contracts' anticompetitive purpose and effect: "prohibit[ing] the carrier from offering a fare on its own website without the cost of the GDS fees built-in."

168.    Operating together, the provisions of the Contractual Restraint preclude the Airlines from sharing with travelers the savings realized from using less costly channels of distribution. A traveler who does not use a GDS must nevertheless pay ticket prices that include

43

the GDS fees. This prevents the Airlines from using price to steer travelers and travel agencies to lower-cost distribution channels.

169.     In addition to imposing the nearly identical terms, Defendants began publicly stressing the importance of the full-content provisions, thereby reinforcing the commitment to their scheme. "Now it's time to move forward as we work together to realize maximum value from the new agreements" was the public cry to arms issued by Sabre's Chief Marketing Officer.

**E.     Defendants Use Industry Trade Groups and Meetings to Monitor Their Cartel.**

170.     Defendants' collusion did not relent once the 2006 agreements were inked. Throughout the Class Period, there were continual contacts among Defendants to ensure that they were reading from the same script. Defendants did not deal with the Airlines unilaterally; they worked in tandem.

1.     <u>Defendants Use the Full Content Committee to Further and Enforce Their Conspiracy.</u>

171.     To maintain and police their conspiracy, Defendants also took advantage of a committee created by the Business Travel Coalition, a for-profit organization formed in 1994 to advocate for Defendants, travel agencies and corporate travel departments. The avowed purpose of this committee, aptly named the Full Content Commission, was to ally Defendants in enforcing their "full content" imperative and forestalling change to the GDS status quo. As the commission head explained, "Of course, it is critical for travel managers and TMCs to remain vigilant—wherever and whenever content is withheld or other attempts are made to undermine distribution economics and managed travel programs. To that end, the Business Travel Coalition is sponsoring a new initiative called the Full Content Commission."

172.     The commission head added, "The Commission will be a watchdog group that will have bark as well as bite." This "bite" would come from the coordinated demands by the

44

GDSs in airline contracting. As stated in a leading travel industry publication, "The commission would give awards to airlines that made . . . promotions widely available to agents and corporations, and it would cite airlines that don't."

173.     Aside from serving as one of the many vehicles Defendants used to communicate with each other, Defendants used this new initiative as a forum to enlist additional cooperation from travel agents in perpetuating the GDS cartel. In November 2006, for instance, Sabre's chief marketing officer emphasized to that audience the importance of

> active participation in industry groups such as . . . the Business Travel Coalition and its new Full Content Commission . . . formed . . . for the express purpose of ensuring the industry realizes maximum value from the new airline agreements. . . . By staying actively engaged and continually making it clear that you demand efficient access to full content, you can help pave the way for continued clarity around full-content access beyond the terms of the current deals.

174.     This manifesto expressed Defendants' common position and strategy. As Sabre explained, breaking ranks would unleash competition that would cause a "race to the bottom." So, Defendants worked together, through the proxy of the Full Content Commission, to ensure that each would continue to demand the Contractual Restraint with the Airlines rather than compete when new GDS contracts were negotiated.

175.     Defendants used these industry coalitions as instruments to rally travel agents' support for GDSs as the sole aggregators of content, reinforcing the "bribery" prong of Defendants' scheme. Travel agents do not pay for Defendants' services. Instead, the Airlines, which have no control over which system a travel agent uses to book a flight, pay the GDS fees. As a result, the GDS fee charged to the Airline is irrelevant to the travel agent's choice of which GDS to use.

176.     But travel agents *are* powerfully influenced by incentive payments from

Defendants. Defendants typically kick back at least half of their GDS fee revenue to their travel

agent subscribers, upwards of two dollars per flight segment. The more an agent uses a GDS, the

higher its revenue. Amadeus put it simply: "The more agencies book, the more they earn." The

perverse result is that agents book travel through the *least* efficient, *most* costly channels—the

opposite of what happens in a properly functioning market.

177.     These incentive payments often exceed the so-called "subscription fee" travel

agents pay to use the GDSs. As a result, travel agents pay "negative prices" for GDS services —

instead of paying for the services that bring them airline content and allow them to book flights,

they actually make money through the use of that service. By lavishing travel agents with

incentive payments, Defendants purchase demand for GDS services—all funded by airlines that

want the opposite result.

2.     <u>Defendants Meet to Align Pricing and Ancillary Content Strategy Before
Contract Renewals.</u>

178.     The Airlines could not stop the cartel during the 2006 contract negotiations, but

they had another opportunity in 2009 and 2010, when their contracts were up for renegotiation.

By then, ancillary products had become a mainstay of airline revenue, eventually helping restore

airline profitability. As Defendants themselves recognize: "In 2006, [ancillary products] were

almost unheard of. In 2014, they are one of the means by which the airline industry returned to

profitability." Defendants cited an International Air Transport Association (IATA) press release

that noted, "Without ancillaries, the industry would be making a loss from its core seat and cargo

products." The importance of ancillary products gave the Airlines strong leverage, at least in

theory. They could determine when, to whom, and under what circumstances to distribute

ancillary content.

46

179.    Defendants admitted that "Airline power to withhold certain fares or types of ancillary content, impose surcharges, or engage in other negotiating conduct available to them is only increasing." In particular, they recognized the "expressed desire of airlines to use access to ancillary fee information as further leverage vis-à-vis GDSs."

180.    American Airlines vice president of sales and general sales manager Kurt Mustache was unequivocal in sharing his carrier's own interpretation: "American Airlines is not, and has never been, contractually required to provide the GDSs access to non-fare products and services," he said in a statement.  American had been pushing its own direct connect offering as its preferred way for travel agencies to purchase some ancillary services.

181.    As early as Spring 2009, fearing that unilateral contract negotiations with the Airlines would "open the floodgates," Defendants focused on this new threat to their pricing cartel.  Sabre, for example, suggested that at the National Business Travel Association conference they hold a "meeting with all the players to firm up our strategy."

182.    As suggested by Sabre, Travelport and Sabre used an industry conference as cover to meet about pricing and strategy. In April 2009, Paul Hesser, Travelport's Vice President of Product Programs & Services ("Hesser"), sent an internal email to other senior executives with the subject "CONFIDENTIAL Sabre Strategy on Pricing Optional Services." In it he disclosed that after sitting on an industry panel discussion with Kyle Moore, Sabre's Vice President of Product Management ("Moore"), the two spoke in detail about Sabre's plans for pricing ancillary products, referred to in the industry as "OC." Specifically, Hesser wrote, "After the session I asked [Moore], 'rumor has it that you're not charging for the distribution of optional services, why would you do that?' He gave me what I believe was an honest answer … Sabre

fully intends to get value out of distributing optional services, but right now its [sic] about getting content."

183.    In a May 2009 exchange, Joelle Cuvelier, Sabre's Director of Product Marketing ("Cuvelier"), who reported to Moore, relayed to him the "competitive info on OC pricing from 1A [Amadeus's airline code is 1A] she received "at a "VERY interesting ATPCO meeting." She went on to say that Amadeus planned to "charge 25 cents per OC shopping or pricing transaction." Moore replied, "Do not talk to anyone about this. You understand. Right?" After Cuvelier identified the source of this information as "RB," (likely to be Robert Buckman, Amadeus's Director of Airline Distribution Strategy ("Buckman")), Moore said, "Okay. I've done a little of that with him too. But, be very careful."   Moore then asked Cuvelier to "just keep it to yourself. Tell no one else." Cuvelier responded, "Ok thanks boss."

184.    In that same exchange, Cuvelier also reported that she had dinner that same night with Travelport's Vice President of Airline Services and its Senior Vice President of International Sales concluding her "VERY interesting" conference.

185.    In a July 16, 2009 internal email to Gross, Chris Wilding, Sabre's Vice President of Airline Distribution Marketing ("Wilding"), expressed fear that entering into an exclusive agreement with an airline could jeopardize Defendants' solidarity. He asked, "How do other airlines respond when they find out we've done an exclusive deal? Do they start playing GDSs against one another? Does this become a zero sum game on GDS share with declining revenues?" Wilding continued, "As a matter of policy, I do think *seeking exclusive deals with many airlines would be bad oligopoly behavior*. It is hard enough competing with "GDSs for agencies, *don't need to drive more competitive framework into airline relationship side of business*." (Emphasis added.)

186.     Defendants' collusion is further exemplified by their approach to negotiations with US Airways about its Choice Seats program, which allows customers to pay in advance for preferred seats. It also evidences Defendants' willingness to act against their self-interest to support the conspiratorial cause.

187.     US Airways wanted to make this ancillary content available through a GDS and invited Sabre to become the first to offer it. Rather than seize this opportunity to gain a competitive advantage over Travelport and Amadeus, Sabre recruited the other Defendants to formulate a common approach to the US Airways' program.

188.     Moore decided that it was best for all of the Defendants to discuss the issue with US Airways. Gross backed the approach and expected the other GDSs to fall in line. Indeed, he admitted that Sabre had already been in contact with Amadeus and appeared to be in agreement: "For what it is worth, Amadeus is using the right language in talking about this (urgent, immediate, etc.)."

189.     On July 15, 2010, Sabre's Moore, Wilding, Cuvelier, and Director of North American Accounts, Jason Toothman ("Toothman"), exchanged emails discussing their plan for a joint meeting with US Airways. Toothman reminded the others that they were to create cover by making it appear that the summit was US Airways' idea, telling them, "I also thought Ama[deus] legal wanted it to be US inviting us to attend together. That hasn't happened yet."

190.     In an email on the following day, Defendants went ahead and broached the meeting to US Airways, requesting "a face-to-face meeting with US where we also include the other GDSs, *with whom we've been working*, to discuss how US Airways enables this for ALL GDS companies . . . ." (Emphasis added.) Moore explained that Defendants would all be better off if "[w]e *will not have to compete* for your attention" and "[w]e will be able to *think through it*

49

*together (all of us)* and be smarter about it." (Emphasis added.) He added that the meeting "would go a long way to *convincing us collectively* that you're really out to solve the problem technically. This is how *we* want to engage your team, as *we* really believe it will help us run faster for both US and the GDS companies." (Emphasis added.)

191.     A few days later, on July 20, after receiving no response from US Airways, Moore, Cuvelier and other Sabre senior executives plotted their next step by email. Moore said, "Before we make a call, I really want to see how they answer us on the four-party meeting. *They are trying to play us against each other, and I want to see if we can kill that*." (Emphasis added.) Cuvelier replied, "Could our plan B be that we meet with US individually *and then regroup among the 3 GDS to align on the approach?*" (Emphasis added.)

192.     Later, after US Airways declined the invitation to jointly meet with all three GDSs, Moore forwarded his communications with US Airways to Fergal Kelly, Travelport's Portfolio Director ("Kelly"), and Thierry Boschat, Amadeus' Director of Portfolio strategy ("Boschat"), "[I]f You guys are okay, it may be better if it came from one of you two – representing the three of us – *to further demonstrate that we're working on this together*." (Emphasis added). He also instructed Cuvelier to contact Amadeus and share Sabre's strategy.

193.     On July 26, apparently after Sabre met individually with US Airways, Cuvelier wrote Moore, "As you know, we do have written instructions from John G at US asking us to not share information with the other GDS about the discussion we will have with them on Thursday. Are you telling me you want me to call Amadeus anyway? And not Travelport? What exactly do you want me to share with them? I have to say I am a bit uncomfortable going against US Airways' direction."

50

194.     In an email to Gross on July 30, 2010, Cuvelier told Gross that she would touch base with Amadeus and find out how their meeting with US Airways went. She went on to tell Gross: "What if Amadeus caves in? In our conversation Thierry [Boschat of Amadeus] was less opposed to an interactive link at Pricing but *changed his mind after Kyle [Moore of Sabre] highlighted the possible risks*." (Emphasis added.)

195.     Amadeus' head of distribution strategy called Sabre's Cuvelier, to, in Cuvelier's words, "practice his speech and key points" on the Defendants' strategy for ancillary products. Cuvelier "gave him a few tips and confirmed Sabre was aligned with Amadeus directionally." Sabre's Gross postponed an internal meeting discussing ancillary products strategy until "Joelle [Cuvelier] had a chance to speak to Amadeus about their strategy."

196.     On August 7, Cuvelier emailed Gross and Wilding to say, "*If all the GDS stand firm on the push model, the airlines will have to at least try our approach first. However, if one of the GDS breaks down (and this is really more between us and Amadeus) then we will have a problem*. . . . I will touch base with Amadeus to find out how their meeting with US went. . . . According to Kyle [Moore], any compromise in that space would put our very GDS business in jeopardy. I have to believe him." (Emphasis added.)

197.     On the same day, Gross wrote Gregg Webb, Executive Vice President of Sabre Corporation and President of Sabre Travel Network ("Webb"): "Chris W[ilding] and Joelle [Cuvelier] think we should push the meeting with you back a week so. . . *Joelle has a chance to speak to Amadeus about their strategy. Kyle and Joelle are very concerned that we are at a critical point and a mistake by any of the GDSs could harm our business irrevocably*." (Emphasis added.)

198.     In August 2010, Moore used the press to clarify Sabre's position that ancillary content should be covered by the Full Content Agreements. He told a leading trade publication, "Our view would be that our contracts already govern this content and that we would simply need to figure out the appropriate technological way to introduce it to our booking path."

199.     The head of airline distribution marketing at Amadeus, Cyril Tetaz, echoed Moore's position, stating, "Whenever we negotiate full content agreements, we include ancillary services as well. That was the case in the past, and for Amadeus, we believe the full content definition we have covers ancillary services, and we've made even more clarification in the past year when we underwent negotiations."

200.     On August 9, 2010, Sabre's CEO called upon attendees at the National Business Travel Association International Convention and Exposition, including the CEOs of Travelport and Amadeus, who also spoke at the conference, to rally around the cause of ancillary fee "transparency."

201.     In September 2010, Travelport's CEO, Jeff Clarke ("Clarke"), reiterated Defendants' full-content strategy, telling a leading industry publication, "As new products and services are provided, it should go into the distribution." In November 2010, a Sabre senior vice president, Martin Cowley, publicly reasserted the commitment to full content, saying, "When we negotiate our distribution agreements with airlines we negotiate for full content and this will inevitably include the ways airlines choose to include these ancillaries—either bundled or unbundled."

202.     The purpose of public statements such as these was to make certain Defendants continued marching in step to prevent any competition that might begin chipping away at GDS content.

203.    Defendants used collective punishment to enforce their cartel. In November 2010, when American Airlines sought to impose a surcharge on tickets purchased through Travelport, Sabre once again did not treat the development as a chance to gain a competitive advantage. Instead, on November 17, 2010, a top Sabre executive informed his fellow executives that he had told the company's employees responsible for converting travel agents "not to exploit this."

204.    In November 2010, American Airlines gave notice to the OTA Orbitz that it would terminate their agreements. Travelport, which had a large ownership stake in Orbitz, retaliated against American. On January 5, 2011, Travelport began biasing content that its GDS displayed to travel agents, making it deceptively appear that American's flights either no longer existed or were not competitive with other airlines, and doubling the GDS fees it charged American. Travelport also began paying Orbitz to resist direct connections from American.

205.    Rather than competing against Travelport by stressing to American that it provided unbiased results, Sabre threw its weight behind Travelport by joining in the retaliation. In early January 2011, it too biased content against American and doubled its GDS fees.

206.    Similarly, on December 9, 2010, when negotiations between Travelport and Alitalia broke down over a "no discount" provision, the president of Sabre's travel network told employees "*I don't want us in any way taking advantage of this*." (Emphasis added.) A senior vice president replied, "loud and clear—*exactly as we played AA/Tport*." (Emphasis added.)

207.    Yet another example is a February 2011 email regarding a "Multi-GDS plan," sent by Jay Jones, Sabre's Senior Vice President of the Americas ("Jones"), to Chris Kroeger, Sabre's Chief Marketing Officer/Senior Vice President of Marketing ("Kroeger"). In it he asked, "Any luck reaching out to Tport execs on how we exchange creds for joint customers (like TNT,

53

Travel Leaders, etc.)? … It is not in either one of our best interests to proliferate multi-GDS desktop where suppliers would get more leverage knowing agencies can access their inventory via another GDS on a multi GDS desktop if they pulled out of GDS." Kroeger responded, "Coincidentally I am at an event with Travis [Christ, Travelport's President of the America's] tomorrow where we are speaking separately. If I see him, I will chat with him about this."

208.     Defendants engaged in these collusive activities to ensure that no deal with an airline would become the leading edge of a wedge to open up the GDS market.

209.     At least one other airline, US Airways, saw these actions as anticompetitive collusion. Based on the nature and timing of the punitive actions by Travelport and Sabre, its experience with GDS-airline relationships and its discussions with others in the travel industry, US Airways concluded that Sabre and Travelport purposefully coordinated their retaliatory conduct to preserve their supracompetitive profits, and to send a message to other airlines not to tamper with GDS industry structure.

210.     When informed of this retaliatory conduct, the DOT warned Sabre against bias, stating in a February 2011 letter that the practice could steer consumers to "relatively inferior flights."

### 3.    Coordinated Opposition to American's Direct Connection Program

211.     Defendants also coordinated their attack on American Airline's competitive product "Direct Connection," which allowed travel agents to access content and book fares directly from American. A Travelport executive reported that he had at least one constructive meeting with Sabre and Amadeus in late 2009 to early 2010 in which they discussed their urgent need to coordinate opposition to American Airline's Direct Connection. John Stow, a former Sabre executive now operating as an industry consultant, emailed Travelport about Defendants' response to American's product.  In seeking to depose Mr. Stow, American described Mr. Stow's

54

email communications with Travelport (which were filed under seal) as "unique evidence" that serves as a "critical link between the conspirators and thus [Stow] is an essential witness." In subsequent phone calls, Travelport and Sabre, at least, planned and reported to each other about contacting their top travel agencies and encouraging them to resist the program. Knowing that what they were doing was illegal, they agreed to keep their cooperation secret.

4.     Other Collusive Behavior

212.     Defendants have collectively refused to permit major airlines and fledgling competitors from accessing their Application Program Interfaces (APIs), the sets of programming commands and standards for accessing Web-based software applications and Web tools. This conduct prevented the GDS rivals from establishing beneficial direct connections through innovative, lower-cost alternatives like Farelogix, which provided electronic components to complement airline systems for improved distribution of content and other products.

213.     For example, an American executive testified that Travelport severed its Farelogix API access, explaining that because American helped create the GDS "beast," it should "continue to live with it." To underscore the message, Sabre did the same thing. This joint action targeted a technology that would enhance content delivery to the benefit of all concerned except Defendants.

214.     Rather than act in their own economic self-interests, Defendants agreed to cooperate with one another and not take advantage of market issues that might be affecting any individual GDS.

5.   Defendants Maintain Their Conspiracy to Secure Full Content in Subsequent Contract Renewals.

215.   Beginning in 2011, during the next major round of GDS agreement renewals, Defendants continued to pursue their full-content strategy. Defendants again united themselves to present the Contractual Restraint as a nonnegotiable condition for giving the Airlines access to business travelers. The Airlines again faced a Hobson's choice: provide Defendants full content and obtain access to their customers or limit content to the GDSs and risk losing business. The Airlines had no choice but to capitulate again to avoid a devastating loss of revenue. The Full Content Agreements were renewed, and Defendants' conspiracy continued.

216.   A January 21, 2011 email chain between Gross and Andrew Nocella of US Airways evidences that full content was a take-it-or-leave-it proposition. Gross wrote "We should talk. Sabre has no offer that does not involve full content. Our deal will expire. We have an offer on the table for full content and no TVL deal—that is rack rate as we discussed. *If US will not commit to full content we should talk about how we have an orderly termination of our distribution relationship* on Jan 27. I am sorry, but I must be clear that *full content is an absolute requirement for US participation in Sabre*." (Emphasis added.)

217.   According to research by professors at Harvard Business School and the National University of Singapore Department of Economics, "As airlines' GDS contracts came up for renewal, GDSs sought to raise the fees.  By 2012, GDS fees met or exceeded prior levels."

218.   The Full Content Agreements remain in effect.

**F.   The GDS Market Characteristics Are Conducive to Collusion.**

219.   The GDS market is tailor-made for a successful cartel. It is highly concentrated and well protected by high barriers to entry, the demand for its product is price inelastic, and it is rife with opportunities for Defendants to collude.

56

1.     The Market Is Highly Concentrated.

220.     Defendants together account for over 99% of GDS domestic airfare bookings in the United States.

221.     The GDS market has a history of inexorable consolidation. Travelport's lineage traces back to 1971, when United rolled out Apollo, one of the first computerized reservation systems ("CRSs"). Apollo later became an independent affiliate of United. The Apollo GDS later formed a global partnership with Galileo, which was acquired by Cendant Corporation, in 2001. The progressive concentration continued after deregulation. In 2006—the year that Defendants and the Airlines entered into the Full Content Agreements—Galileo and Apollo were spun off to form Travelport. Later that year, Travelport announced that it was absorbing one of the four remaining GDS owners, Worldspan, L.P. The acquisition was completed in August 2007, narrowing the field to just the three Defendants.

222.     As a successor in interest to Worldspan, Travelport is liable for all of Worldspan's anticompetitive conduct in connection with GDS fees. In addition, Travelport is liable for its own unlawful conduct.

223.     An express purpose of the Travelport-Worldspan merger was, in Clarke's words, to resist "the strengthening of alternative distribution channels, such as supplier direct channels, [which] continue to influence how travel is purchased." By further consolidating an already highly concentrated market, the merger also made it easier for Defendants to successfully conspire.

2.     There Are High Barriers to Entry Into the GDS Market.

224.     Under normal circumstances, prices above competitive levels attract new entrants into the market. Where there are significant barriers to entry, however, new competition is less likely. By keeping out entrants who would offer a product at lower prices, these barriers favor

57

the formation and survival of conspiracies. Such is the case with the market for GDS services in the United States, where daunting barriers have excluded prospective entrants despite the artificial inflation of GDS fees.

225.     Defendants themselves have acknowledged these barriers. Travelport has listed some of the reasons:

> In order to become a successful participant in the GDS industry, a new market entrant would face several barriers to entry, including . . . the costs and length of time required to establish relationships and negotiate agreements with travel agencies, which are generally operating under multi-year contracts with existing GDSs and which incur costs in converting to a new GDS.

226.     Travelport is correct. Entry into the GDS market would demand costly start-up capital expenditures. And the entrenched relationships between Defendants and the travel agents using their GDSs also impede entry. The money paid by Defendants to win the fidelity of travel agents and cultivate business relationships, and the existence of long-term contracts binding travel agencies to GDSs, forge an alliance that is very hard to breach. More importantly, because of the cartel without the ability of the Airlines to steer customers to lower cost channels, new entrants have no ability to enter and differentiate themselves.

227.     These challenging barriers to entry helped facilitate the formation and maintenance of Defendants' conspiracy, safeguarding Defendants from competitive pressure to unlock the Airlines from the Contractual Restraint.

228.     Without the ability to offer differentiated content, neither the Airlines nor the GNEs could breach these barriers.

### 3.     Prices for GDS Services Are Inelastic.

229.     Price elasticity measures the responsiveness of demand to a change in price. When the seller of a product is able to increase prices without a significant drop in demand,

500390.1

pricing is considered inelastic. Price inelasticity makes a market more susceptible to collusive manipulation by enabling all producers to raise prices with little fear of driving customers to substitute products.

230.    Pricing for GDS services is highly inelastic in large part because there are no feasible substitutes in the presence of the collusively imposed Contractual Restraint. The lack of viable alternatives for the Airlines to connect with corporate travel agents and their customers leaves Defendants free to raise GDS fees without losing a substantial volume of bookings. And even if the Airlines were to shift some of their GDS transactions to another distribution channel, Defendants' revenue loss would not be large enough to make a price increase unprofitable.

231.    In an antitrust action brought by US Airways against Sabre, the carrier's experts opined that Sabre's fees have consistently been almost *triple* what a competitive market would support.

232.    The existence of such supracompetitive fees in the face of the Airlines' resistance to the use of GDSs and the Airlines' thin margins is economic evidence of collusion.

233.    Further economic evidence is the disparity between airline return on invested capital (two to three percent) and the return on investment for GDSs (20 percent).  Defendants have succeeded in steadily maintaining GDS fees despite having transactional costs that have risen at a much slower rate overall and during some periods have actually decreased. According to an industry study published in July 2002, GDS fees climbed about 7% per year between 1990 and 2000, even as "telecommunications costs have dropped like a rock and computing costs have dropped even faster," in the words of Global Aviation Associates, an industry analyst.

234.    Airlines were in serious financial straits following 9/11. During just the three years 2001-2003, airlines suffered staggering combined losses of roughly $27 billion. The

situation was so dire that US Airways (twice) and United, among other airlines, filed for Chapter 11 bankruptcy. American was on the verge of doing the same and several smaller airlines were forced into liquidation. In response, the United States stepped in to give the industry billions of dollars in assistance. Even though the Airlines were facing an existential crisis and were desperate to cut costs—distribution costs in particular—the supracompetitive level of GDS fees did not abate.

235.     Quite to the contrary, Sabre was able to increase its GDS fees by more than 3% in 2003 (after claiming that Amadeus had raised fees by approximately 6%). Sabre succeeded despite its own projection of a 2%-3% decline in bookings because of the Airlines' struggles.

236.     In a competitive market, Defendants would be under enormous pressure to cut their prices, especially when the Airlines were reeling. That is exactly what other major airline suppliers operating in competitive markets did. Aircraft manufacturers, aircraft lessors, food and beverage suppliers, and even labor unions made concessions.

237.     To cite just one statistic among many, in 2002, during the depths of the worst financial crisis in airline history, when passenger traffic was down 8%, Sabre's GDS division actually increased its profit margin by 6% over the previous year.

### 4.     Defendants Have Many Opportunities To Collude.

238.     The GDS industry provides myriad opportunities for Defendants to collude. One is the frequent meetings of several trade associations. In particular, Defendants all regularly attend functions of the Airline Tariff Publishing Company, and most sit on its board. They also attend meetings of the American Society of Travel Agents (ASTA) and the International Air Transport Association (IATA).  All three Defendants have discussed strategy and pricing at industry conferences, including at the National Business Travel Associatradetion, ASTA's Retail Travel Leadership Summit, and Airline Information's 2009 Airline Sales Channel Conference.

239.     Defendants also continued to meet frequently on other occasions, as evidenced by remarks Sabre's CEO, Sam Gilliland, made to a leading travel industry publication. He said, "As a normal course of business, we meet. In fact, we have other GDSs in-house today."

240.     As discussed above (in ¶¶ 159-160, 197-200 and 223), Defendants took advantage of these meetings to further their conspiracy.

241.     The Full Content Commission (discussed in ¶¶ 187-191 above) also served as one of the many vehicles Defendants used to exchange information, discuss shared concerns, conceive and plan joint implementation of strategies and tactics, police compliance with their full-content scheme, and otherwise advance their common interest in preserving the exclusivity of their GDSs—in short, to cooperate in preventing any disruption of the existing "distribution economics" mentioned by Defendants when they created the committee.

242.     Another opportunity Defendants exploited is the use of public statements. The timing of their pronouncements about full content is telling. As the time for renewal of the Full Content Agreements approached, Defendants increased the frequency of their public comments to issue marching orders and ensure that each of them remained faithful to the full-content agenda.

243.     Sabre has also made clear in its public statements why it dislikes a so-called "surcharge model," and the reason is patently anticompetitive. As a Sabre senior vice president put it, "It's sad to say the surcharge issue has incited or caused people to consider alternatives." The message to Sabre's co-conspirators could not be clearer: Prevent everyone from even considering alternatives.

         5.      Defendants Act Against Their Self-Interests.

244.     A glaring example of Defendants' willingness to subordinate their individual interests to the conspiratorial cause is the Backstop Agreement. A true competitor that was

61

offered content exclusively would have leaped at the chance to gain a significant advantage over the other GDSs. Instead, Amadeus and Sabre agreed to share any such content.

245.     Another example of the coordination that was contrary to Defendants' individual economic self-interests, also discussed in detail above, was their collective refusal to offer US Airways' Choice Seats program on their GDSs. When US Air invited Sabre to offer the program, Sabre surrendered its potential competitive advantage by bringing the opportunity to the other Defendants.

246.     When Travelport was to be surcharged by American Airlines in late 2010, Sabre executives told the company's employees responsible for converting travel agents "not to exploit this." And, instead of competing (or even choosing to sit on the sidelines and watch the fight), Sabre came to the aid of its supposed rival and biased results in retaliation for Travelport being surcharged. The same message was given when negotiations between Travelport and Alitalia broke down: the president of Sabre's travel network told employees "*I don't want us in any way taking advantage of this*." (Emphasis added.) A senior vice president replied, "loud and clear— *exactly as we played AA/Tport*." (Emphasis added.)

247.     There are no plausible competitive reasons for these acts against unilateral self-interest.

### G.     Anticompetitive Effect of the Contractual Restraint.

248.     The Contractual Restraint implemented by Defendants' horizontal conspiracy had its intended result, causing a profound anti-competitive effect. It crippled the ability of cheaper, more efficient ticket distribution channels to compete with GDSs, in some instances walling them off from the GDS market entirely. This prevented the Airlines from steering customers away from the expensive GDSs to more cost-effective ticketing services and causing travelers

who book flights on more efficient systems to pay the same fares as those who use the more expensive GDSs.

249.     Freed from external competition and agreeing amongst themselves that they would not compete for content, the Defendants charged inflated GDS fees. These supracompetitive fees increase airline distribution costs, which in turn raises fares for all travelers.

250.     Had Defendants not unlawfully stifled actual and potential competition, the Airlines would have been free to market their services through a variety of channels as they saw fit, travel agents would have had more options to better serve their customers, and travelers would have had access to an array of distribution channels delivering lower air fares. The newly arrived alternative platforms promised greater choice for the Airlines, their passengers and travel agents, driving down GDS fees, sometimes to zero (in the case of direct booking). In short, everyone involved in buying and selling air travel except GDSs would have benefitted from the competition Defendants suppressed.

               1.    <u>The Contractual Restraint Insulates Defendants From Price Competition.</u>

251.     Technological innovation has brought increased efficiency and lower transaction costs to distribution channels in virtually all sectors of the economy. These innovations offered faster, stronger and more versatile electronic systems that were easier to use than outmoded main-frame computer systems. In competitive markets, these attributes enable newer computer systems to replace less efficient, antiquated systems. That natural progression has not occurred in the GDS market, however, and there is only one explanation. Defendants have colluded to protect the archaic GDSs from the onslaught of more efficient booking systems.

252.     It wasn't for want of effort by the Airlines and would-be GDS rivals. The Airlines launched their own websites with markedly lower transaction costs. They introduced

63

direct connections with travel agents that eliminated the expense of the GDS middleman. They tried to partner with the new wave of GNEs, eager to modernize the market with sophisticated systems ready to deliver content more efficiently and flexibly at lower cost. And the Airlines introduced OTAs, another cheaper way to deliver content and book flights.

253.     Each of these alternative systems was foiled by the Contractual Restraint. Instead of legitimately competing and letting market forces determine how airline tickets would be booked, Defendants conspired to preserve their domain by crushing competition. In the words of Sabre's Gross, "We will be protected by our agreement[s] not by the technology." The concessions Defendants concertedly extracted from the Airlines beginning in 2006 protected them very well.

254.     Without the Contractual Restraint, the Airlines could have and would have offered less expensive fares through non-GDS outlets, such as the Airlines' websites and GNEs. To compete with these lower prices, Defendants could have been compelled to lower GDS fees.

255.     As a result of the Contractual Restraint, however, a traveler who books through a GDS overpays for its services and a passenger who books through another channel pays for services he or she doesn't receive. All passengers must pay the same fare, regardless of whether they book their tickets through a GDS.

256.     A Sabre senior executive pronounced the GNEs dead on arrival after the 2006 negotiations:

> We have brought closure to the low cost GDS solution offering per say [*sic*] and the need to take this to the market and respond to the GDS startups (GNEs). With DCA deals now done and the GNEs lack of traction in the market, we do not need a separate low cost GDS in the market.

257.     In addition, internal presentations from the Project Nike team tasked with maintaining Sabre's market position specifically identify the full-content requirement as a

64

contractual means to insulate Sabre—and by extension the other two Defendants—from competition. One noted that full content "increases GDS value" because "[t]he more agencies obtain content outside of the GDS, the less reliant agencies are upon GDS."

258.     In particular, the Contractual Restraint sounded a death knell for GNEs. Referring to one GNE, Sabre explained that "G2 Switchworks had a content advantage which was nullified by our contracts." Unable to steer traffic to GNEs like G2 and ITA, the Airlines withdrew their support and the GNEs withered away. GNEs accounted for less than 0.5 per cent of the US domestic market by 2006.  The threat of new entry was defused, and the GDSs could go about charging whatever they wanted.

259.     The Contractual Restraint also reduces competition by fostering travel agent dependence on GDSs. Since long before the Contractual Restraint, Defendants have conditioned travel agents to use GDSs and each Defendant has exploited single-homing by agents by fastening as many of them as possible to its GDS.

260.     Most of the important corporate travel agencies, which together generate the lion's share of airline revenues derived from business travelers, are of the "brick-and-mortar" variety that grew up before the advent of the Internet and OTAs. Over time these agencies have become dependent on GDSs and their antiquated technology.

261.     If all platforms had the same content at parity, travel agencies have little incentive to switch to a more efficient distribution platform because Defendants share a portion of the GDS fee for every flight segment they book on a GDS. These inducements align travel agencies with Defendants, each having an interest in maintaining GDS dominance and forestalling competition that might drive down GDS fees. Higher fees mean higher profits for Defendants, who are then willing to pay higher kickbacks to the agents.

262.     The DOT has highlighted the anticompetitive nature of this dynamic, noting the incentive payments "encourage travel agencies to choose the system that is the most expensive for participating airlines." The DOT went on to find that the payments have "tended to preserve the systems' market power and denied airlines an opportunity to encourage travel agencies to use alternative electronic means for obtaining information on airline services and making bookings, such as direct links between a travel agency and an airlines [sic] own internal reservations system."

263.     Defendants tighten their hold on travel agents with contracts that either condition incentive payments on booking a minimum number of flight segments or tie them to agent productivity. Either method penalizes agencies for using another booking channel. For example, Sabre's publicly available contracts prescribe what Sabre calls "volume thresholds."

264.     Defendants have used the same approach with OTAs. Orbitz, for instance, has described an agreement it has with Travelport that covers the GDS services provided by both Galileo and Worldspan:

> This agreement contains volume requirements for the number of segments that we must process through Galileo and Worldspan and requires us to make shortfall payments if we do not process the required minimum number of segments for a given year. As a result, a significant portion of our GDS services are provided by Travelport GDSs.

265.     Furthermore, many of Sabre's agreements with travel agents also contain provisions that impose charges on an agency that exceeds a specified "transaction ratio"—that is, books too high a fraction of transactions (broadly defined) on other platforms.

266.     Defendants' dependence on their stable of travel agents is heightened by high concentration in the travel agent market.  In 2003, just ten agencies (excluding Sabre-owned

Travelocity) generated nearly a third of Sabre's agency bookings. In 2006, 1% of travel agencies accounted for more than 63% of third-party bookings.

267.     This focused reliance has prompted the company to include cautionary statements in its SEC filings. A recent example is Sabre's 2014 10-K, that "[s]uch revenue concentration in a relatively small number of travel buyers makes us particularly dependent on factors affecting those companies. For example, if demand for their services decreases, or if a key supplier pulls its content from us, travel buyers may stop utilizing our services or move all or some of their business to competitors or competing channels." Its previous 10-Ks made similar disclosures.

268.     The Contractual Restraint makes GDS fees opaque to travelers. Economic efficiency is best achieved when prices are transparent, so that consumers can intelligently decide whether they value services enough to pay for them.  Where travelers would prefer less expensive alternatives to avoid GDS fees, the solution is not to use hidden subsidies to artificially reduce the price of GDS services and prevent passengers from being steered to the most efficient channels.

269.     During the DOT's deregulation proceedings, Sabre's own experts agreed that disclosure of GDS distribution costs to consumers in the form of service fees would make the relative costs of different ticketing channels more transparent to the consumers and allow them to choose whether to pay more for the time and expertise of a travel agency. One of Sabre's experts pointed out at that time why Defendants don't favor that transparency: "Travelers' limited willingness to pay for the personalized attention of a travel agent is demonstrated by the dramatic increase in carrier-direct bookings."

67

2. <u>The Contractual Restraint Causes Economic Injury to Plaintiffs and the Rest of the Class by Artificially Inflating Ticket Prices for All Passengers.</u>

270. Because the Contractual Restraint shields the GDSs from competition—both externally and amongst themselves—Defendants are able to charge the Airlines GDS fees well above competitive prices. In a competitive world free of the Contractual Restraint, the entry of less costly distribution channels or lower fares on other channels would force Defendants to reduce their fees to prevent an exodus of bookings from their GDSs to their rivals. Competition among the Airlines would, in turn, pressure them to pass their distribution cost savings to consumers, lowering fares for all passengers.

271. As it is, GDS fees are artificially inflated. GDS fees have stabilized at supracompetitive levels and in some instances steadily climbed since Defendants' conspiracy took hold in 2006 even as their transaction costs have fallen. This perversion has been possible only because Defendants' conspiracy has prevented competition from technologically superior distribution platforms.

272. Evidence of this supracompetitive pricing can be found, for example, by examining the cost of data storage, a large component of the expense of running a computers system like GDSs. In 1991, the cost of storing a megabyte of data was approximately $13.00; by 2008, that cost had plummeted to about one penny. The prices for electronic services in competitive markets have reflected this remarkable cost reduction. GDS fees have not.

273. Further proof is the fact that GDS per-segment fees far exceed Defendants' per-segment marginal cost. Indeed, Defendants have been able to attain stratospheric operating margins as high as 670%—far above the margins a competitive market would sustain. These margins have generated the substantial economic profits discussed above, a feat possible only in a market rid of competition.

68

274.     Indeed, this precise mechanism is explained in the EU Commission's decision regarding the Travelport/Worldspan merger in Europe in 2007. In evaluating the merger, the EU Commission noted that allowing travel providers, such as airlines, the ability to surcharge GDS platforms (or even the ability to threaten to surcharge GDS platforms) resulted in travelers shifting to lower-cost channels and put pressure on GDSs to reduce their fees. Moreover, the EU Commission did not oppose the merger (despite the number of GDSs shrinking from four to three) in part because it thought that surcharging would discipline GDSs and stimulate competition.

## VI.    CLASS ACTION ALLEGATIONS

275.     Plaintiffs bring this action pursuant to Federal Rules of Civil Procedure 23(a) and (b)(2), both on behalf of themselves and on behalf of the following classes:

For the purpose of seeking injunctive relief under federal law, a class (the "Class") defined as:

> **All residents of the United States who purchased an airline passenger ticket for travel on any of the Airlines between June 1, 2006 and the present (the "Class Period").**
>
> "Airlines" are American, Continental, Delta, Northwest, United, US Airways, AirTran, Alaska and Jet Blue.

For the purpose of seeking damages under state laws, the Class comprises two groups defined as:

> **All residents of Indirect Purchaser States who purchased, through a third party for use and not for resale, an airline passenger ticket for travel on any of the Airlines between June 1, 2006 and the present ("Group 1").**
>
> **All residents of Indirect Purchaser States who purchased, directly from an Airline for use and not for resale, an airline passenger ticket for travel on any of the Airlines between June 1, 2006 and the present ("Group 2").**
>
> "Indirect Purchaser States" are Arizona, California, District of Columbia, Florida, Hawaii, Illinois, Iowa, Kansas, Maine, Massachusetts, Michigan, Minnesota,

Mississippi, Missouri, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Oregon, Rhode Island, South Carolina, South Dakota, Tennessee, Utah, Vermont, West Virginia and Wisconsin.

Excluded from the Class and Groups are Defendants, their parent companies, subsidiaries, affiliates, predecessors, successors, assigns, officers or directors, any co-conspirators, and any judges or justices assigned to hear any aspect of this action.

276.     Plaintiffs do not know the exact number of Class members because such information is in the exclusive control of Defendants and the Airlines. Plaintiffs believe that, due to the nature of the trade and commerce involved, there are most likely millions of Class members, geographically dispersed throughout the United States, such that joinder of all class members is impracticable.

277.     Plaintiffs' claims are typical of the claims of the Class in that Plaintiffs purchased airline passenger tickets from one or more of the Airlines in the United States. All Class members were damaged by the same wrongful conduct of Defendants and their co-conspirators as alleged herein, and the relief sought is common to the Class.

278.     Numerous questions of law or fact arise from Defendants' anticompetitive conduct that is common to the Class, including but not limited to:

a.     Whether Defendants and their co-conspirators engaged in a contract, combination, and/or conspiracy to fix, raise, maintain, or stabilize prices of airline passenger tickets.

b.     Whether Defendants' conduct caused the prices of airline passenger tickets sold in the United States to be sold at artificially high and supracompetitive levels;

c.     Whether Plaintiffs and the other members of the Class were injured by Defendants' conduct, and, if so, the appropriate class-wide measure of damages for Class members; and

70

        d.      The scope of any injunctive relief to which Plaintiffs and the other members of the Class are entitled.

These and other questions of law and fact are common to the Class and predominate over any questions affecting only individual Class members.

279.    Plaintiffs will fairly and adequately represent the interests of the Class in that they have no conflicts with any other members of the Class. Furthermore, Plaintiffs have retained competent counsel experienced in antitrust, class action, and other complex litigation.

280.    Defendants have acted on grounds generally applicable to the Class, thereby making final injunctive relief appropriate with respect to the Class as a whole.

281.    This class action is superior to the alternatives, if any, for the fair and efficient adjudication of this controversy. Prosecution as a class action will eliminate the possibility of repetitive litigation. There will be no material difficulty in the management of this action as a class action.

282.    The prosecution of separate actions by individual Class members would create the risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

## VII.    TRADE AND COMMERCE

283.    During the Class Period, Defendants have operated their GDSs to distribute airline passenger tickets in a continuous and uninterrupted flow of intrastate and interstate trade and commerce to customers located throughout the United States. These business activities, as well as substantial quantities of equipment and supplies necessary to conduct them, and the payments to the GDSs by Airlines and payments by Defendants to their subscribing travel agents, have traveled in and substantially affected intrastate and interstate trade and commerce.

71

## VIII.   ANTITRUST IMPACT

284.    Defendants' anticompetitive conduct enabled them to raise, fix, and stabilize prices to Plaintiffs and the Class members in excess of the prices Defendants otherwise would have been able to charge absent Defendants' anticompetitive conduct.

285.    Supracompetitive prices for products or services at a higher level of distribution generally result in higher prices at every level below.  This case is no exception.

286.    The Airlines passed on the supracompetitive prices of GDS services to Plaintiffs and Class members.  GDS fees are traceable and identifiable throughout the chain of distribution from the Airlines to Plaintiffs and the Class members.

287.    GDS fees are marginal costs to the Airlines, that is, they are a cost that is paid on a per-transaction basis.  While even a monopolist would increase its prices when the cost of its inputs increased, the economic necessity of passing through cost changes increases with the degree of competition a firm faces. The Airlines are subject to vigorous price competition.

288.    The Airlines have thin net margins, and are therefore at the mercy of their marginal costs, such that increases in the price lead to corresponding increases in prices for airline tickets at the consumer level. According to IATA, from 1970 to 2010 the airline industry overall generated just a 0.1 percent profit margin. For 2012, IATA estimated that global airline revenues were approximately $633 billion, with a profit of $3 billion equating to a 0.5 percent net margin.

289.    The supracompetitive prices paid by Plaintiffs and Class members for Airline tickets are traceable to, and the direct, proximate and foreseeable result of, Defendants' supracompetitive prices for GDS fees.

290.    General economic theory recognizes that any overcharges in the form of supracompetitive prices at a higher level of distribution results in higher prices at every level

72

below.  Herbert Hovenkamp, *Federal Antitrust Policy, the Law of Competition and Its Practice* 624 (1994).  Professor Hovenkamp goes on to state that "[e]very person at every stage in the chain will be poorer as a result of the monopoly price at the top."  He also acknowledges that "[t]heoretically, one can calculate the percentage of any overcharge that a firm at one distribution level will pass on to those at the next level."

291.    The economic and legal literature has recognized that unlawful overcharges of a product or service charge normally result in higher prices for products containing that price-fixed product or service. Two antitrust scholars – Professors Robert G. Harris (Professor Emeritus and former Chair of the Business and Public Policy Group at the Haas School of Business at the University of California at Berkeley) and the late Lawrence A. Sullivan (Professor of Law Emeritus at Southwestern Law School and author of the *Handbook of the Law of Antitrust*) – have observed that "in a multiple-level chain of distribution, passing on monopoly overcharges is not the exception: it is the rule."

292.    Economic literature further confirms that in markets where intermediaries (here Defendants) impose explicit pricing parity, this pricing parity causes over-consumption of intermediaries' services and inhibits efficient intermediation, resulting in inflated retail prices.

293.    This court has recognized that "[t]he practice complained of – the imposition of the Contractual Restraints – is anticompetitive because it allegedly restricts price competition in the market for GDS services, thus forcing US Airways to pay above-market prices, and possibly increasing ticket prices across the board. The supracompetitive fees complained of are classic 'overcharge' damages."

294.    The Airlines agree that absent the Contractual Restraint, ticket prices would be lower.  They claim that "lower booking fees [], because of the intense price competition among airlines, translates into lower ticket prices for consumers."

295.    The DOT has found that the Contractual Restraint increases the cost of all airline passenger tickets.  In a 2014 report, the DOT's economic consulting firm found that "***The contract provision effectively prohibits the carrier from offering a fare on its own website without the cost of the GDS fees built-in***, removing a powerful tool for directing consumers to purchase directly from the carrier."  (emphasis added).

296.    The precise amount of the overcharge can be measured and quantified. Commonly used and well-accepted economic models can be used to measure both the extent and the amount of the supra-competitive charge passed-through the chain of distribution. Thus, the economic harm to Plaintiffs and Class members can be quantified.

297.    In fact, this overcharge was already quantified in the US Airways litigation against Sabre. When assessing the impact to travelers of Sabre's conduct for the US Air litigation, Professor Joseph Stiglitz first noted that "most basic principles of economics show that if the average marginal costs of delivering a service are increased, the prices charged for that service will increase.  ***It is thus airlines travelers who are ultimately harmed*** by Sabre's anti-competitive practice, and in this case, some travelers are especially disadvantaged." (Emphasis added.)

298.    He went on to find that "Higher booking fees translate into higher US [Airways] costs, and ***higher fares to all passengers on US flights***.  Not only do these restrictions prevent discounts on airfares to travelers employing lower-cost ticketing outlets, these restraints on the

price mechanism force self-booking leisure travelers to cross-subsidize travel-agency-served corporate travelers." (Emphasis added.)

299.     Professor Stiglitz opined that if the Contractual Restraint did not exist, in the "but for world," "[c]ompetition in the airline business would cause US [Airways] to pass on its distribution cost savings to consumers in the form of lower airfares. This would result in a net benefit to all travelers, including those choosing to book through the GDS channel, who would pay competitive-level fees as a result of their choices."

## IX.    FRADULENT CONCEALMENT

300.     Throughout the Class Period, Defendants have affirmatively and fraudulently concealed their unlawful conduct. Plaintiffs did not have actual, inquiry or constructive notice of facts giving rise to their claims for relief until March 12, 2015, when the files in the US Airways action, *US Airways v. Sabre Holdings Corp., et al.*, Civ. A. No.1:11-cv-02725-LGS (S.D.N.Y.) were unsealed and made public for the first time. Before that date, Plaintiffs and the other members of the Class did not discover, and could not have discovered through the exercise of reasonable diligence, the existence of Defendants' conspiracy to suppress competition in the relevant markets or the true nature and substance of the acts Defendants have engaged in to further their conspiracy. The nature of Defendants' conspiracy was self-concealing.

301.     Plaintiffs and the other Class members purchased airline tickets from the Airlines, sometimes with the help of travel agents and sometimes not. They had no direct contact or interaction with any of Defendants and had no means from which to obtain knowledge of the terms of the GDS contracts or Defendants' unlawful acts.

302.     Defendants agreed to conceal, and actively and purposefully did conceal, their unlawful actions by secretly organizing, conducting and enforcing their conspiracy, by agreeing not to publicly disclose their scheme, and by giving pretextual explanations and justifications for

the Contractual Restraint and their anticompetitive effects. Defendants' purported reasons for the pricing of GDS fees were materially false and misleading and were made for the purpose of concealing their conspiracy and the actual reasons for inflated prices of airline passenger tickets. Defendants concealed their unlawful conduct by means including the following:

(a)     Agreeing among themselves not to discuss publicly, or otherwise reveal, the existence of their conspiracy;

(b)     Agreeing among themselves not to discuss publicly, or otherwise reveal, the true nature and substance of the actions they have taken in furtherance of their conspiracy;

(c)     Engaging in surreptitious meetings, telephone calls, and other communications in order to create, operate and enforce their conspiracy; and

(d)     Giving false and pretextual reasons for the Contractual Restraint, the amount of the GDS fees they assessed, and increases in the GDS fees during the relevant period.

303.     As one example among many, Sabre and Amadeus included in the Backstop Agreement a clause which precludes either party from issuing a press release or otherwise disclosing the existence of the Backstop Agreement without the prior written approval of the other.

304.     As another example, in the May 2009 telephone conversation in which Cuvelier reported to Moore the competitive pricing she received from Amadeus, Moore instructed her "***Do not talk to anyone about this.*** You understand. Right?" and to "be very careful."

305.     Defendants have consistently misrepresented to the travel industry and travel consumers that because they benefit from having access to all Airline content, it follows that *all*

GDSs *must* have the same full content to serve the consuming public.  Defendants' statements were intended to mask, and did mask, the impact of their conspiracy.

306.     For example, the Backstop Agreement evidences this pretext of benefiting travelers by specifically stating that the agreement is necessary "to enable in turn travel providers access to the greatest number of travel agencies, both [sic] for the benefit of the consumer." Defendants cloak their Backstop Agreement as being necessary to protect the consumer and made "with a view to enhancing and improving their offerings to travel agencies and consumers."

307.     Defendants claim that the GNEs failed not because of the cartel, but because of their own inadequacies. Although internally admitting that the GNEs had viable technology and were able to hurdle the barriers to entry, addressing G2 and ITA specifically, Sabre publicly claimed that, "[i]nefficient solutions for the marketplace such as these will only drive up the cost and complexity for consumers in their search for travel offerings."

308.     A self-proclaimed voice for the Defendants, Travel Technology Association (then known as Travel Services Association) publicly released a study in 2009 called *The Role and Value of the Global Distribution Systems in Travel Distribution.*  The study was propaganda designed to justify to the public why GDS full content was *necessary* for competition, stating: "GDS technology allows for travel, shopping, booking and fulfillment for consumers across thousands of suppliers and products in a single display that provides access to comprehensive information and drives competition among suppliers."

309.     The study further concealed the true impact of Defendants' Full Content Agreement conspiracy by using consumer scare tactics: "Another risk for consumers, intermediaries and GDSs is further penetration of the pay-for-content model, whereby airlines

may compel OTAs and travel agencies to pay for access to some or all of their content via the GDS. This could result in significant downstream distribution costs for intermediaries and consumers, *with consumers ultimately picking up the tab by way of higher all-in prices for air travel.*" (Emphasis added.)

310.     Defendants also falsely represented that without their collective Contractual Restraint, consumers would face increased prices: "Assuming airlines attached a $3.50 per-segment fee to all discount economy fares booked via GDS, this would represent more than $530 million in costs to be shouldered by OTAs, travel agencies and ultimately, consumers."

311.     In 2014 comments to the DOT, Defendants again denied that they have any negotiating leverage with the Airlines:

> The claims concern about depriving carriers of leverage in their negotiations with GDSs is based on outdated conceptions of the GDS and airline industries that harken back to the 1980s and 1990s. In fact, airlines are not captive to each GDS. This is evident in the fact that GDSs collectively now account for about 50% of airline tickets [by volume], with the rest sold by the airlines directly. The GDS share of airline sales has declined significantly from the late 1990s as airlines began to devote more attention and resources to their websites and divested their ownership interest in GDSs. The fact that such large numbers of bookings have migrated to the carrier direct channel in and of itself highlights for airlines and GDSs the potential loss of significant business for any GDS that cannot strike a mutually-acceptable, full-content deal with any large carrier.

312.     In these comments, Defendants again denied any pricing power: "The prolonged descent of GDS pricing to airlines since discounting was first allowed in 2004 should have laid to rest any notion that GDSs have the power to control prices charged to airlines."

313.     Defendants' public statements attempting to justify their conduct and conceal the true impact of their conspiracy continue to the present. Defendants, again through Travel Technology Association, published another study in 2015 self-servingly titled *Benefits of*

78

*Preserving Consumers' Ability to Compare Airline Fares*.  In it, Defendants again cloaked their

conspiratorial Full Content Agreements with the pretext of actually *protecting* competition:

> Yet, at a time when independent, transparent comparison shopping is most needed, some airlines are attempting to restrict access to their fare and schedule information, reduce the ability of consumers to easily compare prices, and drive travelers to their own websites, which do not offer price comparisons with other airlines. For the reasons set out in this report, this combination of airline concentration with heightened attempts to lead travelers away from OTAs and metasearch travel sites is likely to lead to higher average airfares, increase consumers' search costs . . . .

314.     The study misleadingly conflates consumer comparison shopping with

Defendants' collective desire to eliminate competition among themselves for that content: "The

ability to comparison shop is, for the most part, powered by a GDS, to which the travel agencies

and OTAs subscribe."  The study concludes by falsely stating that airlines' attempts to

differentiate content among distribution channels would be costly for consumers: "Perhaps the

most significant of these in competitive terms is the ability (or lack thereof) of consumers to

compare prices across airlines. Transparent and easily accessible comparison-shopping for

airline prices enhances competition between airlines and ultimately benefits consumers."

315.     Defendants' statements in favor of deregulating GDSs were markedly different.

Sabre's submissions clearly indicate that competition among GDSs for airline content would

serve to make the market competitive, stating:

> Absent regulatory constraints, they [Airlines] can reduce their level of participation in a CRS.  Alternatively, as in the webfare episode, they can restrict the CRS' access to desirable fare inventory.  Even if the carrier would lose more than the CRS from total delisting, it may lose far less than the CRS if it only withholds some limited desirable inventory.

316.     As a result of Defendants' fraudulent concealment of their conspiracy, the

running of all applicable statutes of limitations has been tolled with respect to any claims that

Plaintiffs and the other Class members have arising from Defendants' unlawful conduct.

X.      **CONTINUING VIOLATIONS**

317.      Defendants have engaged in a continuing course of unlawful conduct, including conduct that occurred during the applicable limitations periods, that has caused continuing harm to Plaintiffs and the other members of the Class during the applicable limitations periods. Accordingly, Plaintiffs and the other Class members are entitled to recover damages for the harm they suffered during the applicable limitations periods.

318.      Throughout the Class Period and to the present, Defendants have continuously engaged in the unlawful conduct alleged in this Complaint, including overt acts in furtherance of their conspiracy. Most obviously, Defendants have collectively imposed and continue to collectively impose the Contractual Restraint and to charge supracompetitive GDS fees. Every time Plaintiffs and other members of the Class are charged supracompetitive GDS fees, they suffer a new cognizable injury.

319.      Defendants have also continuously engaged in other overt unlawful acts to further their conspiracy, including without limitation:

(a)      Agreeing to exchange and exchanging information that has enabled them to conceive, implement and enforce the Contractual Restraint;

(b)      Agreeing to act and acting in concert with respect to the negotiation of contract terms with the Airlines;

(c)      Agreeing to refrain from and refraining from competing with each other with respect to contractual terms with the Airlines;

(d)      Agreeing to refrain from and refraining from competing with each other with respect to the GDS fees they have charged for their services;

(e)      Agreeing to impose and imposing the Contractual Restraint in each of their respective agreements with the Airlines;

80

(f)     Agreeing to enforce and enforcing the Contractual Restraint;

(g)     Entering into one or more agreements with each other to share content that the Airlines did not provide to another Defendant;

(h)     Participating in conversations and meeting to share information, adopt common strategies and coordinate actions with respect to their agreements and business relationships with Defendants;

(i)     Communicating with each other through public statements to share information, adopt common strategies and coordinate actions with respect their agreements and business relationships with Defendants;

(j)     Agreeing to retaliate and retaliating against the Airlines for planning or taking actions that did impair or might have impaired the effectiveness of Defendants' conspiracy; and

(k)     Agreeing to exchange and exchanging commercially sensitive information that would be withheld from competitors in a competitive environment.

320.    As co-conspirators, Defendants share liability for each of their continuing violations of law.

## XI.    CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF

### Unlawful Horizontal Restraint of Competition
### in Violation of Sherman Act § 1

321.    Plaintiffs incorporate by reference each and every preceding and succeeding paragraph of this Complaint.

322.    The Contractual Restraint controlling the Airlines' marketing and sale of airline tickets has occurred in and had a substantial anticompetitive effect on interstate commerce.

323.    Defendants are a combination within the meaning of Section 1 of the Sherman Act. They have entered into and engaged in a continuing horizontal conspiracy to charge supracompetitive GDS fees in violation of Section 1 of the Sherman Act.

324.    The course, pattern and practice of Defendants' collusive conduct have included, among other things, a continuing agreement, understanding and concert of action among them to impose and enforce the Contractual Restraint. In order to organize and effectuate their illegal combination and conspiracy, Defendants have engaged in a number of overtly collusive acts, including without limitation:

(a)    Agreeing to exchange and exchanging information that has enabled them to conceive, implement and enforce the Contractual Restraint;

(b)    Agreeing to act and acting in concert with respect to the negotiation of contract terms with the Airlines;

(c)    Agreeing to refrain from and refraining from competing with each other with respect to contractual terms with the Airlines;

(d)    Agreeing to refrain from and refraining from competing with each other with respect to airline content or the GDS fees they have charged for their services;

(e)    Agreeing to impose and imposing the Contractual Restraint in each of their agreements with the Airlines;

(f)    Agreeing to enforce and enforcing the Contractual Restraint;

(g)    Entering into one or more agreements with each other to share content that the Airlines did not provide to another Defendant;

(h)     Participating in conversations and meeting to share information, adopt common strategies and coordinate actions with respect to their agreements and business relationships with Defendants;

(i)     Communicating with each other through public statements to share information, adopt common strategies and coordinate actions with respect to their agreements and business relationships with Defendants;

(j)     Agreeing to retaliate and retaliating against the Airlines for planning or taking actions that did impair or might have impaired the effectiveness of Defendants' conspiracy; and

(k)     Agreeing to exchange and exchanging commercially sensitive information that would be withheld from competitors in a competitive environment.

325.    Defendants' unlawful collusion has deterred more efficient and less costly alternative ticket distribution channels from entering and competing in the GDS market, thus depriving Plaintiffs of the benefits of free and open competition and maintaining GDS fees at artificially high, supracompetitive levels in the United States.

326.    As a direct result of Defendants' unlawful horizontal conspiracy, Plaintiffs have suffered, and continue to suffer, injury to their business or property of the type that the antitrust laws were designed to prevent by paying supracompetitive prices for airline tickets.

327.    Plaintiffs and Class members seek a declaratory judgment pursuant to Federal Rule of Civil Procedure 57 and 28 U.S.C. § 2201(a) that Defendants' conduct violates Section 1 of the Sherman Act.

328.    Plaintiffs and the Class also seek equitable and injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26 to correct for the anticompetitive market effects

caused by Defendants' unlawful conduct, and other relief to ensure that similar anticompetitive conduct does not reoccur in the future.

## SECOND CLAIM FOR RELIEF

### Unlawful Horizontal Restraint of Competition in Violation of State Antitrust Laws

329.    Plaintiffs incorporate by reference each and every preceding and succeeding paragraph of this Complaint.

330.    The Contractual Restraint has occurred in and has a substantial anticompetitive effect on intrastate commerce.

331.    Defendants are a combination within the meaning of Section 1 of the Sherman Act. They have entered into and engaged in a continuing horizontal conspiracy to charge supracompetitive GDS fees in violation of state antitrust laws.

332.    The course, pattern and practice of Defendants' collusive conduct have included, among other things, a continuing agreement, understanding and concert of action among them to impose and enforce the Contractual Restraint. In order to organize and effectuate their illegal combination and conspiracy, Defendants have engaged in a number of overtly collusive acts, including without limitation:

(a)    Agreeing to exchange and exchanging information that has enabled them to conceive, implement and enforce the Contractual Restraint;

(b)    Agreeing to act and acting in concert with respect to the negotiation of contract terms with the Airlines;

(c)    Agreeing to refrain from and refraining from competing with each other with respect to contractual terms with the Airlines;

84

(d)      Agreeing to refrain from and refraining from competing with each other with respect to airline content or the GDS fees they have charged for their services;

(e)      Agreeing to impose and imposing the Contractual Restraint in each of their respective agreements with the Airlines;

(f)      Agreeing to enforce and enforcing the Contractual Restraint;

(g)      Entering into one or more agreements with each other to share content that the Airlines did not provide to another Defendant;

(h)      Participating in conversations and meeting to share information, adopt common strategies and coordinate actions with respect to their agreements and business relationships with Defendants;

(i)      Communicating with each other through public statements to share information, adopt common strategies and coordinate actions with respect to their agreements and business relationships with Defendants;

(j)      Agreeing to retaliate and retaliating against the Airlines for planning or taking actions that did impair or might have impaired the effectiveness of Defendants' conspiracy; and

(k)      Agreeing to exchange and exchanging commercially sensitive information that would be withheld from competitors in a competitive environment.

333.      Defendants' unlawful collusion deprived Plaintiffs of the benefits of free and open competition and maintaining GDS fees at artificially high, supracompetitive levels in the United States.

334.      As a direct result of Defendants' unlawful horizontal conspiracy, Plaintiffs have suffered, and continue to suffer, injury to their business or property of the type that the antitrust laws were designed to prevent by paying supracompetitive prices for airline tickets.

335.    By engaging in the foregoing conduct, Defendants entered a conspiracy and

combination in restraint of trade in violation of the following state laws:

    a.  Arizona Rev. Stat. §§ 44-1402, *et seq.*, with respect to purchases in Arizona by members of the Class and/or purchases by Arizona residents.

    b.  Cal. Bus. and Prof. Code §§ 16720, *et seq.*, with respect to purchases in California by members of the Class and/or purchases by California residents.

    c.  D.C. Code Ann. §§ 28-4503, *et seq.* with respect to purchases in the District of Columbia by members of the Class and/or purchases by the District of Columbia residents.

    d.  Hawaii Code §§ 480-4, *et seq.*, with respect to purchases in Hawaii by members of the Class and/or purchases by Hawaii residents.

    e.  740 Ill. Comp. Stat. 10/3, *et seq.*, with respect to purchases in Illinois by members of the Class and/or purchases by Illinois residents.

    f.  Iowa Code §§ 553.4, *et seq.*, and Iowa Code §714H.5 with respect to purchases in Iowa by members of the Class and/or purchases by Iowa residents.

    g.  Kan. Stat. Ann. §§ 50-101, *et seq.*, with respect to purchases in Kansas by members of the Class and/or purchases by Kansas residents.

    h.  Me. Rev. Stat. Ann. tit. 10, §§ 1101, *et seq.*, with respect to purchases in Maine by members of the Class and/or purchases by Maine residents.

    i.  Mich. Comp. Laws Ann. §§ 445.771, *et seq.*, with respect to purchases in Michigan by members of the Class and/or purchases by Michigan residents.

    j.  Minn. Stat. §§ 325D.51, *et seq.*, with respect to purchases in Minnesota by members of the Class and/or purchases by Minnesota residents.

    k.  Miss. Code Ann. §§ 75-21-1, *et seq.*, with respect to purchases in Mississippi by members of the Class and/or purchases by Mississippi residents.

    l.  Neb. Rev. Stat. Ann. §§ 59-801, *et seq.*, with respect to purchases in Nebraska by members of the Class and/or purchases by Nebraska residents.

    m.  Nev. Rev. Stat. Ann. § 598A.060, *et seq.*, with respect to purchases in Nevada by members of the Class and/or purchases by Nevada residents, in that tens of thousands of sales of airline tickets that included a GDS charge took place at the homes or business places of Nevada purchasers or at travel agencies located in Nevada at supracompetitive prices caused by Defendants' conduct.

86

n.  N.H. Rev. Stat. Ann. §§ 356:2, *et seq.*, with respect to purchases in New Hampshire by members of the Class and/or purchases by New Hampshire residents.

o.  N.M. Stat. Ann. §§ 57-1-1, *et seq.*, with respect to purchases in New Mexico by members of the Class and/or purchases by New Mexico residents.

p.  New York General Business Law § 340, *et seq.*, with respect to purchases in New York by members of the Class and/or purchases by New York residents.

q.  N.C. Gen. Stat. §§ 75-1, *et seq.*, with respect to purchases in North Carolina by members of the Class and/or purchases by North Carolina residents.

r.  N.D. Cent. Code §§ 51-08.1-02, *et seq.*, with respect to purchases in North Dakota by members of the Class and/or purchases by North Dakota residents.

s.  Or. Rev. Stat. §§646.725 *et seq.*, with respect to purchases in Oregon by members of the Class and/or purchases by Oregon residents.

t.  R.I. Gen. Laws §§ 6-36-4, *et seq.*, with respect to purchases in Rhode Island by members of the Class and/or purchases by Rhode Island residents.

u.  S.D. Codified Laws Ann. § 37-1-3.1, *et seq.*, with respect to purchases in South Dakota by members of the Class and/or purchases by South Dakota residents.

v.  Tenn. Code Ann. §§ 47-25-101, *et seq.*, with respect to purchases in Tennessee by members of the Class and/or purchases by Tennessee residents, in that the actions and transactions alleged herein substantially affected Tennessee, in that the sales of airline tickets that included a GDS charge took place at the homes or business places of Tennessee purchasers or at travel agencies located in Tennessee at supracompetitive prices caused by Defendants' conduct.

w.  Utah Code Ann. §§ 76-10-3104, *et seq.*, with respect to purchases in Utah by members of the Class and/or purchases by Utah residents.

x.  Vt. Stat. Ann. tit. 9, §§ 2453, *et seq.*, with respect to purchases in Vermont by members of the Class and/or purchases by Vermont residents.

y.  W.Va. Code §§ 47-18-3, *et seq.*, with respect to purchases in West Virginia by members of the Class and/or purchases by West Virginia residents.

z.  Wis. Stat. § 133.03, *et seq.*, with respect to purchases in Wisconsin by members of the Class and/or purchases by Wisconsin residents, in that the actions and transactions alleged herein substantially affected the people of Wisconsin, with thousands of Class members in Wisconsin paying

87

substantially higher price for GDS charges in that the sales of airline tickets that included a GDS charge took place at the homes or business places of Wisconsin purchasers or at travel agencies located in Wisconsin at supracompetitive prices caused by Defendants' conduct.

### THIRD CLAIM FOR RELIEF

### Unlawful Horizontal Restraint of Competition
### in Violation of State Consumer Protection Laws

336.     Plaintiffs incorporate by reference each and every preceding and succeeding paragraph of this Complaint.

337.     The Contractual Restraint has occurred in and has a substantial anticompetitive effect on intrastate commerce.

338.     Defendants are a combination within the meaning of Section 1 of the Sherman Act. They have entered into and engaged in a continuing horizontal conspiracy to charge supracompetitive GDS fees, in violation of state consumer laws.

339.     The course, pattern and practice of Defendants' collusive conduct have included, among other things, a continuing agreement, understanding and concert of action among them to impose and enforce the Contractual Restraint. In order to organize and effectuate their illegal combination and conspiracy, Defendants have engaged in a number of overtly collusive acts, including without limitation:

(a)     Agreeing to exchange and exchanging information that has enabled them to conceive, implement and enforce the Contractual Restraint;

(b)     Agreeing to act and acting in concert with respect to the negotiation of contract terms with the Airlines;

(c)     Agreeing to refrain from and refraining from competing with each other with respect to contractual terms with the Airlines;

88

(d)      Agreeing to refrain from and refraining from competing with each other with respect to airline content or the GDS fees they have charged for their services;

(e)      Agreeing to impose and imposing the Contractual Restraint in each of their respective agreements with the Airlines;

(f)      Agreeing to enforce and enforcing the Contractual Restraint;

(g)      Entering into one or more agreements with each other to share content that the Airlines did not provide to another Defendant;

(h)      Participating in conversations and meeting to share information, adopt common strategies and coordinate actions with respect to their agreements and business relationships with Defendants;

(i)      Communicating with each other through public statements to share information, adopt common strategies and coordinate actions with respect to their agreements and business relationships with Defendants;

(j)      Agreeing to retaliate and retaliating against the Airlines for planning or taking actions that did impair or might have impaired the effectiveness of Defendants' conspiracy; and

(k)      Agreeing to exchange and exchanging commercially sensitive information that would be withheld from competitors in a competitive environment.

340.      Defendants' unlawful collusion has deprived Plaintiffs of the benefits of free and open competition and has maintained GDS fees and airline fares at artificially high, supracompetitive levels in the United States.

341.      As a direct result of Defendants' unlawful horizontal conspiracy, Plaintiffs have suffered, and continue to suffer, injury to their business or property of the type that the antitrust laws were designed to prevent by paying supracompetitive prices for airline tickets.

342.     By engaging in the foregoing conduct, Defendants entered a conspiracy and combination in restraint of trade in violation of the following state laws:

**California**

343.     Plaintiffs incorporate by reference each and every preceding and succeeding paragraph of this Complaint.

344.     There was a gross disparity between the price that Plaintiffs and the Class members paid for the GDS fees embedded in Airline tickets and the value received.

345.     As a direct and proximate result of Defendants' unfair competition or unfair acts or practices in violation of the California Unfair Competition Law, Plaintiffs and Class members were forced to pay higher prices.

346.     By reason of the foregoing, Defendants have violated California's Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200, *et seq*.  California Plaintiffs on behalf of the California Class Members alleges as follows:

    a.  Defendants committed acts of unfair competition, as defined by section 17200, *et seq*., by engaging in a conspiracy to fix and stabilize the price of GDS fees as described above.

    b.  The acts, omissions, misrepresentations, practices and non-disclosures of Defendants, as described above, constitute a common and continuing course of conduct of unfair competition by means of unlawful business acts or practices with the meaning of section 17200, *et seq*., including, but not limited to (1) violation of Section 1 of the Sherman Act; (2) violation of the Cartwright Act.

    c.  Defendants' acts, omissions, misrepresentations, practices and nondisclosures are unfair, unconscionable, unlawful and/or fraudulent independently of whether they constitute a violation of the Sherman Act or the Cartwright Act.

    d.  Defendants' acts or practices are fraudulent or deceptive within the meaning of section 17200, *et seq*.

    e.  By reason of the foregoing, California Plaintiff and the California Class Members are entitled to full restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that may have been obtained by

Defendants as a result of such business acts and practices described above.

347.    Plaintiffs and the Class have been injured in their business and property by reason of Defendants' anticompetitive, unfair, unconscionable or deceptive acts alleged herein. Their injury consists of paying higher prices for air travel than they would have paid in the absence of such violations.  This injury is of the type the California Unfair Competition Law is designed to prevent and directly results from Defendants' unlawful conduct. Accordingly, Plaintiffs seek equitable relief in the form of judicial declarations, restitution and disgorgement.

**Florida**

348.    Plaintiffs incorporate by reference each and every preceding and succeeding paragraph of this Complaint.

349.    The Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. Ann. § 501.204, prohibits unfair methods of competition and unfair acts or practices in the conduct of any trade or commerce.

350.    An "unfair practice," within the meaning of the Florida Deceptive and Unfair Trade Practices Act, is one that offends established public policy and one that is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers.

351.    By reason of the foregoing, Defendants have violated the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. §§ 501.201, *et seq*.

352.    Florida Plaintiffs on behalf of the Florida Class members allege as follows:

a.   Defendants' unlawful conduct had the following effects:

1.  price competition for GDS fees was restrained, suppressed, and eliminated throughout Florida;

2.  prices for GDS fees were raised, fixed, maintained, and stabilized at artificially high levels throughout Florida;

3.  Florida Plaintiffs and the Florida Class members were deprived of

91

free and open competition; and

4. Florida Plaintiffs and the Florida Class members paid supra-competitive, artificially inflated prices for airline tickets that contained embedded GDS fees.

b. During the Class Period, Defendants' illegal conduct substantially affected Florida commerce and consumers.

c. As a direct and proximate result of Defendants' unlawful conduct, Florida Plaintiffs and the Florida Class members have been injured and are threatened with further injury.

d. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Fla. Stat. §§ 501.201, *et seq*., and, accordingly, Florida Plaintiffs and the Florida Class members seek all relief available under that statute.

353.     Plaintiffs and the Class have been injured in their business and property by reason of Defendants' unfair methods of competition and unfair acts or practices alleged herein. Their injury consists of paying higher prices for GDS fees and airline fares than they would have paid in the absence of such violations.  This injury is of the type Florida Deceptive and Unfair Trade Practices Act is designed to prevent and directly results from Defendants' unlawful conduct.

354.     As a direct and proximate result Defendants' unfair and unlawful practices, Plaintiffs and the Florida Class Members have suffered and will continue to suffer injury and losses of money and property and are entitled to damages in an amount to be proven at trial, reasonable attorneys' fees and costs, and such equitable relief, including an injunction, as the Court deems to be necessary and proper.

**Illinois**

355.     Plaintiffs incorporate by reference each and every preceding and succeeding paragraph of this Complaint.

356.     The Illinois Consumer Fraud and Deceptive Business Practices Act, 815 Ill. Comp. Stat. 505/1, *et seq.*, prohibits unfair methods of competition and unfair acts or practices. Further, the Illinois Consumer Fraud and Deceptive Business Practices Act gives express consideration to interpretations of the FTC relating to Section 5 of the Federal Trade Commission Act.

357.     Defendants engaged in unfair business practices in violation of the Illinois Consumer Fraud and Deceptive Business Practices Act by using unfair business practices to enter into an unlawful cartel which restricted the ability of the Airlines, including United, to market and sell airline tickets through distribution channels other than GDSs with the intent and effect of suppressing competition in the GDS market and maintaining supracompetitive GDS fees.

358.     This unfair and unlawful agreement not to compete has prevented less expensive airline tickets without embedded supracompetitive GDS fees from being available in the market, causing Illinois Class Members to pay overcharges.

359.     Defendants' acts constitute an unfair trade practice in that they: (a) offend public policy as established by statutes, the common law or otherwise and is within at least the penumbra of some common law, statutory or other established concept of unfairness; (b) are immoral, unethical, oppressive, or unscrupulous; and (c) causes substantial injury to consumers, competitors or other businesses, including Plaintiffs and the Illinois Class members.

360.     The actions and transactions constituting Defendants' unfair acts and practices causing harm to Illinois Class members occurred primarily and substantially in Illinois under the pragmatic, functional analysis employed by courts in that (a) although Defendants committed many of the acts, omissions and conduct detailed herein outside of Illinois, Defendants' unlawful

93

conduct did not terminate at the borders of other states, but were intended to and did impact all Class members located in and throughout Illinois; (b) Plaintiffs and Illinois Class members made purchases in Illinois, the location of the impact of Defendants' unfair acts or practices; (c) Plaintiffs and Illinois Class Members incurred losses and suffered damages within Illinois; and (d) all transactions injuring the Illinois Class members occurred in Illinois.

361.    As a direct and proximate result Defendants' unfair and unlawful practices, Plaintiffs and the Illinois Class Members have suffered and will continue to suffer injury and losses of money and property and are entitled to damages in an amount to be proven at trial, reasonable attorneys' fees and costs, and such equitable relief, including an injunction, as the Court deems to be necessary and proper.

**Missouri**

362.    Plaintiffs incorporate by reference each and every preceding and succeeding paragraph of this Complaint.

363.    The Missouri Merchandising Practices Act, Mo. Rev. Stat. § 407.010, *et seq.*, prohibits "the act, use or employment by any person of any deception, fraud, false pretense, false promise, misrepresentation, unfair practice or the concealment, suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise in trade or commerce," as further interpreted by the Missouri Code of State Regulations, 15 CSR 60-7.010, *et seq.*, 15 CSR 60-8.010, *et seq.*, and 15 CSR 60-9.010, *et seq.*, and Mo. Rev. Stat. § 407.025, which provides for the relief sought in this count.

364.    Defendants engaged in the conduct described herein in connection with the pricing of GDS fees in trade or commerce in a market that includes Missouri.

94

365.    Defendants agreed to, and did in fact affect, fix, control, and/or maintain, at artificial and non-competitive levels, the prices at which GDS fees were set, distributed, or obtained in Missouri, which conduct constituted unfair practices in that it was unlawful under federal and state law, violated public policy, was unethical, oppressive and unscrupulous, and caused substantial injury to Missouri Plaintiff and the members of the Missouri Damages Class.

366.    Defendants concealed, suppressed, and omitted to disclose material facts to Missouri Plaintiff and the members of the Missouri Damages Classes concerning Defendants' unlawful activities and artificially inflated prices for GDS fees. The concealed, suppressed, and omitted facts would have been important to Missouri Plaintiff and the members of the Missouri Damages Classes as they related to the cost of airline tickets that they purchased.

367.    Defendants misrepresented the real cause of GDS fee prices by making public statements that were not in accord with the facts.

368.    Defendants' statements and conduct concerning GDS fees were deceptive as they had the tendency or capacity to mislead Missouri Plaintiff and the members of the Missouri Damages Classes to believe that they were purchasing airline tickets at prices established by a free and fair market. Defendants' unlawful conduct had the following effects: (1) GDS fee price competition was restrained, suppressed, and eliminated throughout Missouri; (2) GDS fees were raised, fixed, maintained, and stabilized at artificially high levels throughout Missouri; (3) Missouri Plaintiff and members of the Missouri Damages Classes were deprived of free and open competition; and (4) Missouri Plaintiff and members of the Missouri Damages Classes paid supra-competitive, artificially inflated prices for airline tickets.

369.    The foregoing acts and practices constituted unlawful practices in violation of the Missouri Merchandising Practices Act. As a direct and proximate result of the above-

95

described unlawful practices, Missouri Plaintiff and members of the Missouri Damages Classes suffered ascertainable loss of money or property.

370.    Accordingly, Missouri Plaintiff and members of the Missouri Damages Classes seek all relief available under Missouri's Merchandising Practices Act.

**South Carolina**

371.    Plaintiffs incorporate by reference each and every preceding and succeeding paragraph of this Complaint.

372.    The South Carolina's Unfair Trade Practices Act, S.C. Code Ann. §§ 39-5-10, *et seq.*, makes it unlawful to engage in any "[u]nfair methods of competition or deceptive acts or practices in the conduct of any trade or commerce."

373.    Defendants violated the South Carolina's Unfair Trade Practices Act by using unfair business practices to enter into an unlawful cartel with the intent and effect of suppressing competition in the GDS market and maintaining supracompetitive GDS fees, embedded in all airline tickets.

374.    As direct and proximate result of Defendants unlawful cartel had the effect of suppressing competition in the GDS market and maintaining supracompetitive GDS fees, causing South Carolina Class members to pay overcharges.

375.    By reason of the foregoing, Defendants have violated South Carolina's Unfair Trade Practices Act, S.C. Code Ann. §§ 39-5-10, *et seq.*  South Carolina Plaintiff on behalf of the South Carolina Damages Class alleges as follows:

    a.   Defendants' unlawful conduct had the following effects:

        1.   GDS fees price competition was restrained, suppressed, and eliminated throughout South Carolina;

        2.   GDS fees were raised, fixed, maintained, and stabilized at artificially high levels throughout South Carolina;

     3.   the South Carolina Plaintiff and South Carolina Class members were deprived of free and open competition; and

     4.   the South Carolina Plaintiff and South Carolina Class members paid supra-competitive, artificially inflated prices for GDS fees, embedded in all airline tickets.

   b.   During the Class Period, Defendants' illegal conduct substantially affected South Carolina commerce and consumers.

   c.   As a direct and proximate result of Defendants' unlawful conduct, the South Carolina Plaintiff and South Carolina Class members have been injured and are threatened with further injury.

   d.   Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of South Carolina Revised Statutes Annotated §§ 39-5-10, *et seq.*, and, accordingly, the South Carolina Plaintiff and South Carolina Class members seek all relief available under that statute.

376.    As a direct and proximate result Defendants' unfair and unlawful practices, Plaintiffs and the South Carolina Class Members have suffered and will continue to suffer injury and losses of money and property and are entitled to damages in an amount to be proven at trial, reasonable attorneys' fees and costs, and such equitable relief, including an injunction, as the Court deems to be necessary and proper.

## XII.   <u>PRAYER FOR RELIEF</u>

WHEREFORE, Plaintiffs pray that the Court enter judgment on their behalf and on behalf of the Class herein, adjudging and decreeing that:

A.    This action may proceed as a class action, with Plaintiffs designated as Class representatives and their counsel as Class counsel;

B.    Defendants have engaged in a contract, combination, and conspiracy in violation of Section 1 of the Sherman Act (15 U.S.C. § 1) and state law antitrust and consumer protection statutes, and that Plaintiff and the members of the Class have been injured in their business and property as a result of Defendants' violations;

500390.1

C.      Defendants, their subsidiaries, affiliates, successors, transferees, assignees, and the respective officers, directors, partners, agents, and employees, and all other persons acting or claiming to act on their behalf be permanently enjoined and restrained from continuing and maintaining their contract, combination and conspiracy;

D.      Plaintiffs and the other members of the Class be awarded damages in an amount to be proven at trial for the injuries they sustained as a result of Defendants' unlawful conduct, and that a judgment in their favor be entered against Defendants trebling the awarded damages to the extent permissible under federal antitrust laws; Plaintiffs and the other members of the Class be awarded pre-judgment and post-judgment interest as allowed by law, at the highest legal rate from the date of service of this Complaint;

E.      Plaintiffs and the other members of the Class recover their costs of this suit, including reasonable attorneys' fees and costs as provided by law;

F.      Such other relief as the Court deems equitable and just be award to Plaintiffs and the other members of the Class.

Dated: July 17, 2015                                Respectfully submitted,

                                                    /s/Mayra V. Tarantino
                                                    Joseph J. DePalma
                                                    Mayra V. Tarantino (NY Bar #MT2389)
                                                    **LITE DEPALMA GREENBERG**
                                                    570 Broad Street, Suite 1201
                                                    Newark, NJ 07102
                                                    Tel: (973) 623-3000
                                                    Fax: (973) 623-0858
                                                    jdepalma@litedepalma.com
                                                    mtarantino@litedepalma.com

                                                    Krishna B. Narine
                                                    Joel C. Meredith
                                                    **MEREDITH & NARINE**
                                                    100 S. Broad St.
                                                    Suite 905

98

Philadelphia, PA 19110
Telephone: 215-564-5182
Facsimile: 267-687-1628
knarine@m-npartners.com
jmeredith@m-npartners.com

99